[No. F034897. Fifth Dist. June 10, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DONTEE TYREE HESTER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Jo Anne D. Roake, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Lloyd G. Carter and Michelle L. West, Deputy Attorneys General; Edward R. Jagels, District Attorney, Thomas D. Sparks, Assistant District Attorney, Robert A. Barton and Garrett L. Hamilton, Deputy District Attorneys, for Plaintiff and Respondent.

## OPINION

**CORNELL, J.**—Dontee Tyree Hester was arrested after the vehicle in which he was riding was stopped by Bakersfield police officers who believed the vehicle might be involved in criminal activity related to the criminal street gang known as the East Side Crips. The officers found a loaded firearm in the vehicle. After the trial court denied his motion to suppress, Hester pled guilty to conspiracy to possess a firearm. (Pen. Code, §§ 182, subd. (a)(1), 12031, subd. (a)(2)(C).)[1]

In our original opinion, we reversed the judgment because we concluded the officers did not have probable cause to stop the vehicle and, therefore, the trial court erred in denying Hester's motion to suppress.

The Supreme Court granted review on March 13, 2002, S102961. On January 14, 2004, the case was transferred back to this court with instructions to vacate our decision and reconsider the matter in light of *Maryland v. Pringle* (2003) 540 U.S. 366 [157 L.Ed.2d 769, 124 S.Ct. 795], and *People v. Sanders* (2003) 31 Cal.4th 318 [2 Cal.Rptr.3d 630, 73 P.3d 496].

We have received supplemental briefing from the parties and reviewed the authority cited in the transfer order. We conclude that *Maryland v. Pringle* and *People v. Sanders* support our original conclusion that the trial court erred in denying Hester's motion to suppress. We reiterate our previous decision in all other respects and, once again, reverse the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

We draw the following factual summary from the undisputed testimony at the suppression hearing, where the only witnesses to testify about the stop were Bakersfield Police Officers Gary Carruesco and Martin Heredia.

Heredia and Carruesco were on patrol on the night of August 6 and the early morning of August 7, 1999, in an area of Bakersfield the officers considered East Side Crips territory. Heredia and Carruesco were aware that earlier that evening a drive-by shooting had occurred at Casa Loma Park. Two people were killed in that shooting and at least two others were

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

wounded. Some of the victims were members of the Country Boy Crips criminal street gang, a rival of the East Side Crips. Heredia and Carruesco also were aware it was believed that either East Side Crips or West Side Crips, another criminal street gang, were responsible for the Casa Loma Park shooting.[2]

At approximately 12:30 a.m., Heredia and Carruesco observed three vehicles, a Chevrolet, Chrysler, and Mazda, driving side by side on a three-lane road. The officers followed the vehicles and used the spotlights on their patrol vehicle to determine what persons and how many were in the vehicles. They determined that four Black males between 15 and 25 years of age occupied the Chevrolet, and one of these individuals was Leon Anderson. They also determined four individuals occupied the Chrysler and two were Black males of the same age. They could not identify the sex or race of the two rear passengers in the Chrysler. The officers did not observe the number, race or sex of the occupants in the Mazda. The officers could not identify any individual other than Anderson. Carruesco believed, nonetheless, that four Black males were in each vehicle.

Heredia had encountered Anderson on one other occasion. He did not know from this encounter, however, whether Anderson was affiliated with any gang. Carruesco had encountered Anderson on at least five other occasions in East Side Crips territory. Each time, Anderson had been in the presence of other members of the East Side Crips.

On one occasion, Carruesco had spoken with Anderson. At that time Anderson said he used to be a member of the East Side Crips but was no longer associated with the gang. Anderson admitted having many friends who were gang members. Carruesco observed several gang-related tattoos on Anderson.

Other individuals with whom Carruesco talked also had indicated that Anderson was one of the original members of a subset of the East Side Crips. Based on this information, Carruesco opined that Anderson was a current member of the East Side Crips. He also suspected the other occupants of the vehicle were members of the East Side Crips.

Carruesco and Heredia followed the three vehicles for approximately one-half mile. They observed the vehicles change lanes from driving side by side to all following each other closely in a single lane. This maneuver preceded entrance into the left-turn lane. From the point that Carruesco and Heredia first looked into the interior of the vehicles with their spotlight until the vehicles were stopped was a distance of less than one-quarter mile. After

---

[2] The West Side Crips also are rivals of the Country Boy Crips criminal street gang.

making these observations and deductions, Carruesco and Heredia activated the emergency lights on their vehicle, an unmarked police car, and stopped the Chevrolet.

Carruesco explained his justification for the stop of the Chevrolet:

"Based on the occupants of the vehicle being all black males and the recognition of Mr. Anderson as an East Side Crip, it has been my experience that gang members oftentimes hang out together in large groups because they have strength in numbers and [are] more intimidating in a larger group. [¶] . . . [¶]

"There had been a shooting at Casa Loma that turned into a homicide where the East. Side Crips were suspected to be suspects. I believed that if they knew that they were suspected as being suspects, they would probably arm themselves. [¶] . . . [¶]

"There has been since I've been working here, an ongoing feud between those specific gangs, and it has been my experience that when there is a shooting against one gang, the victim gang retaliates against the suspect gang in a short period of time. [¶] . . . [¶]

"Based on the fact that there was a homicide in rival gang member territory and the fact that the East Side Crips were being named as the suspects, it is my opinion that the East Side Crips would arm themselves in fear of retaliation and for their own protection."[3]

The four occupants in the Chevrolet were Anderson, Michael Anthony Hanks, Hester, and a juvenile Black male (collectively defendants). Although not pertinent to our analysis, upon approaching the Chevrolet after the traffic stop, Heredia observed one of the passengers with a handgun. When the vehicle was searched, a loaded handgun was located under the front seat. Cocaine base was found in the back seat of the police vehicle in which Hester was placed after he was arrested.

The defendants were charged in count one with conspiracy to carry a loaded firearm in a vehicle by members of a criminal street gang. (§§ 182, subd. (a)(1), 12031, subd. (a)(2)(C).) The information also alleged the conspiracy was committed for the benefit of a criminal street gang. Hester

---

[3] Carruesco admitted the stop was not made as a result of a Vehicle Code violation. Carruesco also testified that he wanted to stop the Chevrolet to determine if one of the occupants was Terry Turner, an East Side Crip, believed to be one of the individuals responsible for the shooting at Casa Loma Park. The People have abandoned this argument as a ground for justifying the stop of the Chevrolet.

was charged in count two with possession of a controlled substance. (Health and Saf. Code, § 11350, subd. (a).)

The defendants moved to suppress the gun and to dismiss the indictment, arguing that Carruesco and Heredia did not have probable cause to stop the vehicle and there was no evidence of a conspiracy. The trial court denied both motions. Hester then pled guilty to count one and the criminal street gang allegation. Count two was dismissed.

## DISCUSSION

I. *Hester's Right to Contest the Stop*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Suppression Motion*

Hester contends Carruesco and Heredia did not have sufficient cause to justify the initial detention of the Chevrolet and, accordingly, any evidence obtained as a result of the stop should have been suppressed. The People argue there was reasonable suspicion to detain the vehicle. We begin by repeating the majority of our discussion on this issue from our vacated opinion.

The rules for review of denial of a motion to suppress are well established. This court reviews the explicit and implicit factual findings to determine if they are supported by substantial evidence. (*People v. Soun* (1995) 34 Cal.App.4th 1499, 1507 [40 Cal.Rptr.2d 822].) We then exercise our independent judgment to determine if the facts found by the trial court establish a seizure in violation of the Fourth Amendment. (*Ibid.*)

Moreover, the rules applicable to search and seizure also are easily stated, if not easily applied. A seizure within the meaning of the Fourth Amendment occurs whenever an individual's liberty is restrained by the police, either by physical force or an assertion of authority, to which the individual submits, in circumstances in which a reasonable person would have believed he or she was not free to leave. (*People v. Soun, supra,* 34 Cal.App.4th at p. 1515.) Distinctions are drawn between "detentions" and

---

[*]See footnote, *ante*, page 376.

"arrests," since, although both are seizures under the Fourth Amendment, the constitutional standard for permissible detentions "is of lesser degree than that applicable to an *arrest.*" (*People v. Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) A detention may be undertaken " 'if there is an articulable suspicion that a person has committed or is about to commit a crime' " (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784 [195 Cal.Rptr. 671, 670 P.2d 325]), while probable cause for an arrest exists only "when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime." (*People v. Price* (1991) 1 Cal.4th 324, 410 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

■ Our concern is with the initial detention of the Chevrolet in which the defendants were traveling. Temporary detention of individuals during the stop of an automobile by the police constitutes a detention under the Fourth Amendment. (*Whren v. U.S.* (1996) 517 U.S. 806, 809–810 [135 L.Ed.2d 89, 116 S.Ct. 1769].) The reasonableness of official suspicion is measured by what the officers knew before they acted. (*Florida v. J.L.* (2000) 529 U.S. 266, 271 [146 L.Ed.2d 254, 120 S.Ct. 1375].)

■ We are required to determine whether Carruesco's reasoning resulted in a seizure that was in violation of the Fourth Amendment. "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982].) We focus on the totality of the circumstances in assessing whether the particularized and objective facts known to the police provided reasonable cause to detain appellant. (*Id.* at p. 238.)

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions— inferences and deductions that might well elude an untrained person.

"The process does not deal with hard certainties, but with probabilities. . . . Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." (*United States v. Cortez* (1981) 449 U.S. 411, 418 [66 L.Ed.2d 621, 101 S.Ct. 690].)

Therefore, the issue presented in this case is whether Carruesco and Heredia had a particularized and objective basis to suspect someone in the Chevrolet had committed, or was about to commit, a crime, based on the information the officers knew at the time of the stop of the vehicle.

The People argue that although Carruesco and Heredia could identify only one individual in the Chevrolet, they had a particularized and objective basis to suspect the occupants of the Chevrolet had committed a crime by carrying a loaded firearm in a vehicle. In their original brief, the People relied on the principles stated in *Cortez*. The People emphasized the "whole picture," as well as the "inferences and deductions" Carruesco made in deciding to stop the Chevrolet.

The whole picture consists of the Casa Loma Park shooting, the three cars driving together at 12:30 a.m. in East Side Crips territory, the identification of one occupant as an East Side Crip, and the presence of several Black males in the Chrysler and Chevrolet.

The inferences and deductions include (1) all three vehicles were traveling together; (2) everyone in the Chevrolet was an East Side Crip because they were Black males and were riding with Anderson; (3) everyone in the Chrysler was an East Side Crip because there were two Black males in the car and they were traveling with the Chevrolet; (4) everyone in the Mazda was an East Side Crip because the Mazda was traveling with the Chevrolet, even though Carruesco did not know the age, sex, or race of the occupants; (5) these gang members were aware of the Casa Loma Park shooting; (6) these gang members were expecting retaliation; and (7) these gang members were armed because they were expecting retaliation.

In our original opinion, we concluded the stop violated the Fourth Amendment for two reasons. First, the inferences and deductions drawn by Carruesco were not supported by the facts. Second, the inferences and deductions made did not lead to a particularized and objective basis to suspect someone in the Chevrolet was engaged in criminal activity.

Carruesco's first conclusion, that all three cars were traveling together, is minimally supported by his observations. His observations, however, were for a very short distance. Carruesco did not provide any facts to support this

conclusion other than that the cars were traveling side by side and later were in the same lane together. While Carruesco undoubtedly believed the three cars were traveling together, the observations were insufficient to permit such a conclusion.[5]

Next, Carruesco inferred that each individual in the Chevrolet was a gang member because the only individual in the car that he identified was known to him to be an East Side Crip, the cars were driving in East Side Crips territory, and the Chevrolet contained Black males between 15 and 25 years of age. This conclusion, while one possible explanation for the few facts he observed, is unreasonable. There are far too many other possible explanations that fit these facts to conclude that everyone in the cars was a gang member. The only way to justify Carruesco's conclusion is to assume as fact that every Black male between the ages of 15 and 25 in this part of Bakersfield is an East Side Crip, or that every Black male between the ages of 15 and 25 who is in a car with an East Side Crip also must be an East Side Crip. These conclusions are far too consistent with racial profiling to be constitutionally permissible. (*Whren v. U.S., supra,* 517 U.S. at p. 813; *United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 885–886 [45 L.Ed.2d 607, 95 S.Ct. 2574].) Carruesco testified, in fact, that only a small percentage of Black males in Bakersfield were members of the East Side Crips, directly undermining his conclusion.

Carruesco's third conclusion, that everyone in the Chrysler was an East Side Crip, is even more suspect. First, he observed only two of the occupants in the Chrysler. For all Carruesco knew, the other two occupants could have been elderly females. Second, the short time Carruesco followed the three cars did not justify his conclusion that the three cars were traveling together. Even if they were traveling together, the myriad of innocent explanations ignored by Carruesco precludes the conclusion that every occupant in the Chrysler was an East Side Crip.

Since we conclude that the inference that the occupants of the Chrysler were East Side Crips was unreasonable, Carruesco's conclusion that the occupants of the Mazda were East Side Crips also was unreasonable. Carruesco did not know the sex, race, age or number of occupants in the Mazda.

---

[5] Carruesco did not testify that he saw the three vehicles maneuver in a tight formation. The People rely on Carruesco's testimony to justify the stop of the Chevrolet. Heredia testified he observed some maneuvering by the vehicles, but this testimony appears to be referring to when the three vehicles changed from driving side by side to driving in single file. The observation also was made from a distance, and Heredia could see only taillights moving in the lanes. There is no testimony that this maneuvering violated any traffic laws.

Carruesco's assumption that every East Side Crip knew about the Casa Loma Park shooting also was unreasonable. Carruesco admitted he knew of no facts to show that the occupants, even if they were gang members, knew about the Casa Loma Park shooting. The shooting in the park occurred six hours before the stop. At least two suspects were arrested a short time after the shooting. While Carruesco may have believed that every East Side Crip knew of the shooting, a mere belief will not support a detention. (*People v. Conway* (1994) 25 Cal.App.4th 385, 389 [30 Cal.Rptr.2d 533].)

Carruesco's final inference—that these gang members were expecting retaliation that night and, accordingly, were armed—is belied by Carruesco's testimony. First, Carruesco admitted that when he stopped the Chevrolet he did not know and could not determine whether any occupant would be armed or if a gun would be found.

Second, Carruesco testified that retaliation has been ongoing for a period of at least two years between rival gangs.[6] He has seen retaliation for gang shootings that has occurred months after the first shooting. He admitted it was impossible to anticipate when retaliation would occur. Carruesco's reasoning, if accepted, would justify the stop of every vehicle in which four young Black males were riding for at least the last two years and into the foreseeable future. This reasoning would also permit detention of every Black male in the presence of a suspected current or former member of a criminal street gang. Carried to an extreme, this reasoning could be used to justify searches of the person, vehicle or home of every known or suspected, current or former, criminal street gang member in Bakersfield. They all may be armed because they all may be anticipating retaliation for some real or perceived slight. And that is all Carruesco knew when he stopped the Chevrolet—the occupants *may* be armed because they *may* be expecting retaliation because they *may* be gang members and they *may* have heard that there was a shooting in Casa Loma Park some six hours earlier.

The trial court, at one point during the hearing, recognized the fallacy of Carruesco's reasoning. "And this is the scary thing about this case, from my perspective. . . . I feel very uncomfortable with the idea or the concept that simply because you've got four male African-Americans in the vehicle at 12:30 a.m., that you can conclude from that that they're East Side Crips because they're in East Side Crip territory."

■ We disagree with our dissenting colleague. The Fourth Amendment does not permit detentions on such speculation. A detention is permissible

---

[6] Officer William Darbee also testified that there have been very few times in the last five years when criminal street gangs have not been fighting in Bakersfield.

only when there are specific *articulable facts* that, when considered in light of all the circumstances, provide some *objective* basis for concluding the person being detained may be involved in criminal activity. (*People v. Souza, supra,* 9 Cal.4th at p. 231.) Carruesco was unable to state any facts to indicate the occupants in this car were engaged in criminal activity. His assumptions, beliefs, opinions and guesswork are simply not the objective facts and permissible inferences required by the Fourth Amendment. (*People v. Conway, supra,* 25 Cal.App.4th at p. 389.) The trial court erred when it failed to recognize this fundamental prerequisite to a constitutionally permissible detention.

We also find support for our conclusion in *United States v. Cortez, supra,* 449 U.S. at p. 411. In *Cortez* the border patrol was investigating a particular group that was smuggling illegal aliens across the border. The border patrol learned the following facts during a two-month investigation. The area they were investigating was a border crossing for illegal aliens. Over a period of time they located numerous tracks of individuals, all of which headed from the Mexican border and terminated near a specific point at Highway 86. Because they terminated at the highway, the officers concluded that a vehicle picked up the groups.

One set of footprints, which appeared repeatedly, left an impression with a distinctive pattern. The investigating officers designated this person "Chevron" and concluded he was the guide. Because the tracks often led to dead ends that required backtracking by the groups, and these areas easily would be avoided in daylight, the officers concluded the trips were made at night. By examining the tracks, the officers determined that the groups usually contained between 8 and 20 individuals. Based on the times when they discovered Chevron's tracks, the officers determined that Chevron usually led groups across the border during or near weekends and on nights when the weather was clear.

The investigating officers were on duty on a Sunday night in late January. The absence of Chevron's tracks revealed that his last border crossing was in early January. The night in question was the first clear night after three days of rain. The officers concluded there was a strong possibility that Chevron would make a crossing that night.

The officers assumed that if Chevron made a crossing that night, he would leave Mexico after dark. They estimated the time it would take to make the crossing on foot and determined that Chevron would reach the pickup point between 2:00 a.m. and 6:00 a.m. that morning. The officers also determined that the pickup vehicle would approach the pickup point from the east and then return to the east, since that was the direction the groups were walking before they were picked up and it was unlikely that the groups would walk away from their ultimate destination.

On the night in question, the officers began their surveillance of Highway 86, approximately 27 miles east of the pickup point. The officers were looking for a vehicle large enough to carry groups of illegal aliens without drawing unwanted attention, such as pickups, vans, motorhomes and campers. They also were looking for a vehicle that headed westbound and then returned eastbound, within one and one-half hours, the time they estimated it would take to make the round trip from their vantage point to the pickup point. Only one distinctive camper met the criteria established by the officers. When the officers stopped the vehicle, they found six illegal aliens in the camper and an individual wearing shoes that matched the pattern of Chevron's shoes.

■ The United States Supreme Court held the detention did not violate the Fourth Amendment. The court began by reiterating that the Fourth Amendment applied to brief investigatory stops, such as the one at issue here. (*United States v. Cortez, supra,* 449 U.S. at p. 417.) "Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances— the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. [Citations.]" (*Id.* at pp. 417–418.)

The United States Supreme Court concluded the officers used objective facts to draw permissible inferences to form a legitimate basis for suspecting a particular person and for action on that suspicion. (*United States v. Cortez, supra,* 449 U.S. at p. 419.) The court held that, based on the whole picture of the two-month investigation, these experienced border patrol agents reasonably could surmise that the particular vehicle they stopped was engaged in criminal activity. (*Id.* at pp. 421–422.)

Our original opinion concluded that the "whole picture" did not form a legitimate basis for suspicion that anyone in the Chevrolet was committing an illegal act. Carruesco and Heredia's investigation lasted closer to two minutes than two months. They were on a heightened state of alert because of the desire to prevent escalation of ongoing gang conflicts. In contrast to the extensive investigation and rational deductions found in *Cortez,* Carruesco and Heredia acted on a hunch and intuition, neither of which will support a detention. (*People v. Conway, supra,* 25 Cal.App.4th at p. 389.)

■ Reducing this stop to its essence, Carruesco and Heredia acted because a passenger in the vehicle was a member of the East Side Crips. Mere membership in a criminal street gang, without additional *facts* supporting an inference of criminal activity, does not permit a detention. (*People v. Rodriquez* (1993) 21 Cal.App.4th 232, 239 [26 Cal.Rptr.2d 660].) Carruesco and Heredia violated the Fourth Amendment rights of the occupants of the Chevrolet by stopping the vehicle without a particularized and objective basis for suspecting the persons stopped of criminal activity.

III. *Probation Search Conditions*

The People also contended originally that even if Carruesco and Heredia illegally detained the vehicle, the motion to suppress properly was denied because three of the occupants in the Chevrolet were subject to probation or parole search conditions. Again, we repeat the majority of our original discussion of the issue.

Although the record is far from clear, it appears that Hester, Hanks, and the juvenile male were on probation.[7] Carruesco and Heredia were unaware the occupants were on probation at the time they stopped the Chevrolet. Hester argues that because Carruesco and Heredia did not know anyone in the Chevrolet was on probation, the detention cannot be justified by a probation search condition.

Resolution of this issue requires a review of California Supreme Court cases dealing with parole and probation searches. In *People v. Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251], the defendant was suspected of committing a robbery, during which a convenience store clerk was killed. The defendant was on parole with a warrantless search condition. After the defendant was arrested, the police searched the apartment he lived in, with the consent of defendant's parole officer. Incriminating evidence was found in the apartment.

■ The defendant argued the incriminating evidence should have been suppressed because the search was conducted without a warrant. The Supreme Court first affirmed that parolees have a reduced expectation of privacy and, accordingly, certain governmental intrusions into their privacy are permissible. (*People v. Burgener, supra,* 41 Cal.3d at p. 531.) The Supreme Court, after noting the myriad of regulations a parolee is subjected

---

[7] The record is unclear as to the terms of probation for any of the parties. We granted the People's request to take judicial notice of court orders involving Hester's probation. The orders reflect that at the time of the stop, Hester was on juvenile probation and subject to a search condition "when it is suspected that [Hester is] in possession of or [has] ingested a narcotic or restricted dangerous drug [or] stolen property [or] weapons of any type."

to upon release from prison, held "The interest in parole supervision to ensure public safety, which justifies administrative parole revocation proceedings in lieu of criminal trial with the attendant protections accorded defendants by the Bill of Rights, also permits restrictions on parolees' liberty and privacy interests. Balancing these interests of the parolee against the societal interest in public safety leads us to conclude that warrantless searches of parolees are not per se unreasonable if conducted for a purpose properly related to parole supervision." (*Id.* at p. 532.) The court continued that society's interest in public safety permits parole searches on a reasonable suspicion standard, a standard that would not rise to the level of probable cause in the typical criminal context. (*Id.* at p. 534.) This standard must be based on articulable facts and rational inferences that would lead an objectively reasonable person to conclude there was reasonable suspicion that the parolee was involved in criminal activity. (*Ibid.*) The Supreme Court concluded that the search met the required standard and the fact that the search was conducted for the purpose of discovering evidence to support new criminal charges was of no moment. (*Id.* at p. 536.) "The societal interest in parole supervision and in the speedy return of parole violators to prison in order to protect the public has added weight, not less, when a reasonable suspicion exists to believe that a parolee has been involved in criminal activity. Any violation of the law is also a violation of the conditions of a parole. The law enforcement purpose of the police who seek authorization from the parole agent for a warrantless search, and the parole supervision purpose of the agent who gives that authorization are indistinguishable." (*Ibid.*)

In *People v. Bravo* (1987) 43 Cal.3d 600 [238 Cal.Rptr. 282, 738 P.2d 336], the defendant was a probationer with a warrantless search condition as a condition of his probation. Police officers received a tip that defendant was selling drugs. Although surveillance of his residence did not reveal any suspicious activity, a search of his residence pursuant to the probation terms located illegal drugs.

■ Defendant argued that a search pursuant to the probation requirement could occur only if the officers had reasonable cause to suspect defendant was involved in criminal activity. The Supreme Court disagreed, holding that by accepting probation with a warrantless search condition, the defendant voluntarily waived his right to privacy, save only his right to object to harassment or to object to searches conducted in an unreasonable manner. (*People v. Bravo, supra,* 43 Cal.3d at p. 607.) The Supreme Court distinguished *Burgener* by distinguishing between probation, in which a probationer voluntarily waives a right to be free from unreasonable searches in exchange for escaping a prison sentence, and parole, in which the warrantless search requirement is not voluntary. (*Id.* at p. 608.) A parolee does not waive his right to be free from unreasonable searches, but the condition is imposed on him by statute on his release from prison. A probationer, however,

voluntarily waives his right since probation is a privilege, and the probationer has an option to refuse the condition if he or she finds it too burdensome. (*Ibid.*)

The Supreme Court added that the probationer's waiver of his Fourth Amendment rights did not allow searches undertaken for harassment or searches for arbitrary or capricious reasons. (*People v. Bravo, supra,* 43 Cal.3d at p. 610.) "We do not suggest that searches of probationers may be conducted for reasons unrelated to the rehabilitative and reformative purposes of probation or other legitimate law enforcement purposes. . . . We hold only that a search condition of probation that permits a search without a warrant also permits a search without 'reasonable cause,' as the former includes the latter. [Citation.]" (*Id.* at pp. 610–611.)

In *In re Tyrell J.* (1994) 8 Cal.4th 68 [32 Cal.Rptr.2d 33, 876 P.2d 519], a juvenile was on probation and was subject to a search condition at any time by any law enforcement officer. An officer stopped the juvenile and some friends because of suspicious behavior. The officer did not know the juvenile was on probation. During the course of the stop, the officer searched the juvenile and found illegal drugs. The trial and appellate courts both concluded that, absent the probation term, the search violated the Fourth Amendment.

The Supreme Court, after distinguishing between adult and juvenile probationers, concluded the juvenile did not have a reasonable expectation of privacy that society was willing to recognize as legitimate. (*In re Tyrell J., supra,* 8 Cal.4th at p. 86.) "Tyrell J. was subject to a valid search condition, directly imposed on him by the juvenile court in a prior matter. We presume he was aware of that limitation on his freedom, and that any police officer, probation officer, or school official could at any time stop him on the street, at school, or even enter his home, and ask that he submit to a warrantless search. There is no indication the minor was led to believe that only police officers who were aware of the condition would validly execute it. The minor certainly could not reasonably have believed [the officer] would not search him, for he did not know whether [the officer] was aware of the search condition. Thus, any expectation the minor may have had concerning the privacy of his bag of marijuana was manifestly unreasonable." (*Ibid.,* italics omitted.)

Parole searches were addressed next in *People v. Reyes* (1998) 19 Cal.4th 743 [80 Cal.Rptr.2d 734, 968 P.2d 445], where the court addressed the "tension" between *Tyrell J.* and *Burgener.* In *Reyes,* defendant was on parole and agreed to a parole condition that permitted any law enforcement officer to search him and his residence without a warrant. Defendant's parole officer

received a tip that defendant may be under the influence of illegal narcotics. The parole agent requested the local police to evaluate defendant to determine whether the tip was accurate. The officers observed defendant exiting a small shed in back of his house but did not identify any suspicious activity. The officers searched the shed and located methamphetamine.

 The Supreme Court held that when an involuntary search condition is properly imposed, the searching officers are not required to have a reasonable suspicion of criminal activity before conducting the search. "Such a search is reasonable within the meaning of the Fourth Amendment as long as it is not arbitrary, capricious or harassing." (*People v. Reyes, supra,* 19 Cal.4th at p. 752.) Accordingly, the search of defendant did not violate his Fourth Amendment rights.

In *People v. Woods* (1999) 21 Cal.4th 668 [88 Cal.Rptr.2d 88, 981 P.2d 1019], an officer observed Mofield carrying a long object covered by a cloth, walking in front of a house occupied by Loza. The officer knew that Loza was on probation and that she had agreed to warrantless searches of her residence. When Mofield saw the officer, he quickened his pace and turned into a driveway. The officer detained Mofield and discovered a long knife under the cloth and drugs and drug paraphernalia on his person.

After he was arrested, Mofield told the officer he resided with Loza. Believing he would find incriminating evidence against Mofield, the officer decided to conduct a probation search of Loza's residence. When he knocked on the door, Loza refused permission to enter. The officer reminded Loza of her probation search condition and entered the premises. He discovered defendants, who also lived in the residence, in a bedroom, along with additional drugs and paraphernalia.

 The trial court ordered the evidence against defendants suppressed because it found that the officer used the probation search condition as a pretext to look for incriminating evidence against Mofield. The Supreme Court accepted this factual finding but reversed the trial court's order of suppression, concluding that the subjective intent of the officer conducting the search is irrelevant. (*People v. Woods, supra,* 21 Cal.4th at pp. 680–681.) The Supreme Court found that the probation search was justified because the officer had been told three days before that drugs were being sold out of the house and because of Mofield's actions as observed by the officer that day. (*Id.* at p. 681.) The Supreme Court limited its holding by stating that the search may not exceed the probation search clause at issue, may not be undertaken in a harassing or unreasonable manner, and is limited to those portions of the residence over which the officers reasonably believe the probationer has complete or joint control. (*Id.* at p. 682.)

In *People v. Robles* (2000) 23 Cal.4th 789 [97 Cal.Rptr.2d 914, 3 P.3d 311], the Supreme Court was faced with the question of a warrantless search conducted at the home of a probationer. The officers suspected defendant, who lived with the probationer, of being involved in the theft of a car. The officers believed the stolen vehicle was located in the garage of the residence shared by the probationer and defendant, who were brothers. At the time the officers conducted the search, however, they were not aware the probationer lived at the house and that his probation contained a search condition. The People tried to justify the otherwise illegal search by arguing the police had a right to conduct the search since the probationer lived at the house.

The Supreme Court rejected the argument and found the search violated the Fourth Amendment. "It is true that if persons live with a probationer, common or shared areas of their residence may be searched by officers aware of an applicable search condition. [Citations.] Critically, however, cohabitants need not anticipate that officers with no knowledge of the probationer's existence or search condition may freely invade their residence in the absence of a warrant or exigent circumstances. Thus, while cohabitants have no cause to complain of searches that are reasonably and objectively related to the purposes of probation—for example, when routine monitoring occurs [citation] or when facts known to the police indicate a possible probation violation that would justify action pursuant to a known search clause [citation]—they may legitimately challenge those searches that are not." (*People v. Robles, supra,* 23 Cal.4th at pp. 798–799.)

Significant for our purposes, the Supreme Court rejected the People's argument that any search conducted of a probationer's home is authorized, regardless of whether the police had knowledge that the probationer resided at the home. "Contrary to the People's argument, *People v. Woods, supra,* 21 Cal.4th 668, does not support the proposition that police officers may lawfully enter a residential premises, without a warrant and without any awareness of a resident's probation search condition, to indiscriminately search for and seize evidence of suspected criminal wrongdoing. As our decisions indicate, searches that are undertaken pursuant to a probationer's advance consent must be reasonably related to the purposes of probation. [Citations.] Significantly, a search of a particular residence cannot be 'reasonably related' to a probationary purpose when the officers involved do not even know of a probationer who is sufficiently connected to the residence. Moreover, if officers lack knowledge of a probationer's advance consent when they search the residence, their actions are wholly arbitrary in the sense that they search without legal justification and without any perceived limits to their authority." (*People v. Robles, supra,* 23 Cal.4th at p. 797.)

The United States Supreme Court's decisions on this issue are not helpful. The only decision we found that remotely approaches this issue is *Whren v.*

*U.S., supra,* 517 U.S. 806, which held that a Wisconsin statute that provided that parole searches could be conducted without a warrant any time a parole agent had a reasonable suspicion the parolee was involved in criminal activity did not violate the Fourth Amendment. *Whren* did not hold that the Fourth Amendment imposes a reasonable suspicion requirement.

The Supreme Court approached the issue in *United States v. Knights* (2001) 534 U.S. 112 [151 L.Ed.2d 497, 122 S.Ct. 587]. Knights was subject to a probation search condition. An officer investigating a string of arson fires was aware of the probation search condition and formed a reasonable suspicion that Knights was responsible for the fires. Knights contended the search violated the Fourth Amendment because the search was conducted for investigative purposes instead of probationary purposes.

The Supreme Court reiterated that "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests.' [Citation.] Knights' status as a probationer subject to a search condition informs both sides of that balance." (*United States v. Knights, supra,* 534 U.S. at pp. 118–119.) The Supreme Court held "that the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." (*Id.* at p. 122.) The Supreme Court did not decide whether the probation search condition "so diminished, or completely eliminated, Knights' reasonable expectation of privacy (or constituted consent, [citation]) that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion." (*Id.* at p. 120, fn. 6.)

 We concluded in our original opinion that the California Supreme Court cases do not require that a police officer have a reasonable suspicion of criminal activity to conduct a warrantless search pursuant to a probation waiver. The United States Supreme Court has not held otherwise. The search, however, reasonably must be related to the probation requirement. This will require in most, if not all, situations, that the officer know at the time the search is conducted that the person or residence being searched is subject to a warrantless search. With one exception, the California Supreme Court has not held that a probation waiver may justify a search where the officer did not know that the person or residence was subject to such a waiver.

The one exception to this analysis, *Tyrell J.*, is distinguishable because this case presents a different issue. We are not concerned with whether a probation waiver can justify a search; the issue in this case is whether the stop of a lawfully operated vehicle can be justified because a passenger in the vehicle was on probation when the officers stopping the vehicle had no knowledge of the probation/parole status of any occupant in the vehicle.

■■■■ We answered no to that question in our original opinion. We can envision no conduct more unreasonable than stopping a vehicle and then hoping the stop later can be justified if one of the occupants in the vehicle happens to be on probation or parole. Such a stop cannot reasonably be related to a probation/parole search condition because the officer(s) did not know the individual was on probation or parole. We have not located, and the parties have not cited, any Supreme Court case that has approved such conduct. We concluded in our original opinion that whether such conduct is described as unreasonable harassment, or arbitrary and capricious, it is prohibited by the Fourth Amendment.

IV. *Review and Remand*

The order transferring this case back to us required us to vacate our original decision and reconsider the issue in light of *People v. Sanders, supra,* 31 Cal.4th 318, and *Maryland v. Pringle, supra,* 540 U.S. 366 [124 S.Ct. 795].

In *Sanders* the defendants, Sanders and McDaniel, shared an apartment. Neighbors called the police when they heard the two arguing. When Sanders opened the door, there were signs that a physical altercation had occurred. The police entered the apartment, handcuffed both defendants, and performed a protective sweep of the premises. During the protective sweep, the officers observed evidence of drug sales. The officers learned that McDaniel was on parole with a search condition. The officers then searched the premises and found illegal drugs. The defendants pled guilty after the trial court denied their motions to suppress.

The Supreme Court held that the protective sweep was not justified as a parole search. (*People v. Sanders, supra,* 31 Cal.4th at p. 322.) After analyzing both United States Supreme Court precedent and its own precedent, the Supreme Court concluded "Sanders had a reduced expectation of privacy because she was living with a parolee subject to a search condition, but she 'need not anticipate that officers with no knowledge of the probationer's existence or search condition may freely invade their residence in the absence of a warrant or exigent circumstances.' (*People v. Robles, supra,* 23 Cal.4th 789, 799.) The circumstance that McDaniel was on parole while the defendant's brother in *Robles* was on probation makes no difference; the expectation

of privacy of cohabitants is the same whether the search condition is a condition of probation or parole. It is clear that the search was unlawful as to Sanders." (*Sanders,* at p. 330.)

The Supreme Court reached the same conclusion regarding McDaniel. (*People v. Sanders, supra,* 31 Cal.4th at p. 332.) The Supreme Court cited two reasons for this result. First, the reasonableness of a search is determined by the circumstances *known* to the police officer at the time he conducts the search. A parole search condition of which the police officer did not know, therefore, cannot be included in the circumstances that are considered when determining the reasonableness of a search. (*Id.* at pp. 332–334.)

The second reason for the Supreme Court's holding was that to hold otherwise would be to encourage police misconduct. This conclusion was based on the sanction imposed for violation of the Fourth Amendment's prohibition against unreasonable searches and seizures—the exclusionary rule. "The rule serves ' "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." ' [Citation.] 'The rule also serves another vital function—"the imperative of judicial integrity." [Citation.] Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions. Thus, in our system, evidentiary rulings provide the context in which the judicial process of inclusion and exclusion approves some conduct as comporting with constitutional guarantees and disapproves other actions by state agents. A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which pro-duced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur.' [Citations.] [¶] Thus, the admission of evi-dence obtained during a search of a residence that the officer had no reason to believe was lawful merely because it later was discovered that the suspect was subject to a search condition would legitimize unlawful police conduct. Accordingly, we hold that an otherwise unlawful search of the residence of an adult parolee may not be justified by the circumstance that the suspect was subject to a search condition of which the law enforcement officers were unaware when the search was conducted." (*People v. Sanders, supra,* 31 Cal.4th at pp. 334–335.)

The issue in *Pringle* was whether a police officer had probable cause to arrest the defendant, one of three persons occupying a vehicle lawfully stopped for speeding. When the officer asked for the vehicle registration, Pringle opened the glove compartment of the car. The officer observed over $700 wrapped in a roll in the glove compartment. After verifying Pringle was

not wanted, the police officer warned Pringle about his speed and requested permission to search the vehicle. Pringle consented. Cocaine was found in the back seat. The officers arrested all three occupants when none would admit ownership of the cocaine.

Pringle contended the officer did not have probable cause to arrest him. The Supreme Court disagreed. (*Maryland v. Pringle, supra,* 540 U.S. at p. 374 [124 S.Ct. at pp. 798, 802].) After citing well-established authority on probable cause to arrest,[8] the Supreme Court distinguished two cases, *Ybarra v. Illinois* (1979) 444 U.S. 85 [62 L.Ed.2d 238, 100 S.Ct. 338] and *United States v. Di Re* (1948) 332 U.S. 581 [92 L.Ed. 210, 68 S.Ct. 222].

In *Ybarra* a warrant was obtained to search a tavern and its bartender for controlled substances. In executing the warrant, the officers also searched Ybarra, one of the tavern's customers, and found heroin. The Supreme Court held the search violated the Fourth Amendment. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. [Citation.] Where the standard is probable cause, a search or seizure of a person must be supported

---

[8] "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing the law in the community's protection.' [Citation.] On many occasions, we have reiterated that the probable-cause standard is a ' "practical, nontechnical conception" ' that deals with ' "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." ' [Citations.] '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' [Citation.]

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. [Citations.] We have stated, however, that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' [citation], and that the belief of guilt must be particularized with respect to the person to be searched or seized, [citation]. In *Illinois v. Gates* [(1983) 462 U.S. 213, 235 [76 L.Ed.2d 527, 103 S.Ct. 2317]], we noted:

" 'As early as *Locke v. United States*, 11 U.S. 339, 7 Cranch 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context: "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . . It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the quanta . . . of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. [Citation.] Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision.' [Citation.]

"To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause, [citation]." (*Maryland v. Pringle, supra,* 540 U.S. at p. 371 [124 S.Ct. at pp. 799–800].)

by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." (*Ybarra v. Illinois, supra,* 444 U.S. at p. 91.)

The *Pringle* court distinguished *Ybarra*. "This case is quite different from *Ybarra*. Pringle and his two companions were in a relatively small automobile, not a public tavern. In *Wyoming v. Houghton* [(1999)] 526 U.S. 295 [143 L.Ed.2d 408, 119 S.Ct. 1297], we noted that 'a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.' *Id.,* at 304–305 . . . . Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." (*Maryland v. Pringle, supra,* 540 U.S. at p. 373 [124 S.Ct. at p. 801].)

In *Di Re* an informant told an officer that he would be receiving counterfeit gasoline ration coupons from Buttitta at a designated place. The officer arrived at the designated place to find his informant sitting in a car holding gasoline ration coupons. Also in the car were Buttitta and Di Re. The informant stated that he had received the counterfeit coupons from Buttitta. All three were arrested. The Supreme Court held there was not probable cause to arrest Di Re because there was no information implicating Di Re and no information pointing to Di Re's possession of the counterfeit coupons. (*United States v. Di Re, supra,* 332 U.S. at pp. 592–594.) "Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person." (*Id.* at p. 594.)

The *Pringle* court distinguished *Di Re* because no one in this case provided information about the ownership of the money or the cocaine before they were arrested. (*Maryland v. Pringle, supra,* 540 U.S. at p. 374 [124 S.Ct. at p. 801].)

The People contend that *Sanders* and *Pringle* compel us to abandon our original analysis and conclude that "based on his training and experience, Officer Carruesco had reasonable suspicion to believe that Leon Anderson was traveling with gang members and firearms." According to the People, if we analyze the facts in a nontechnical fashion, there was a reasonable suspicion that a crime was being committed. The People base this argument on the above cited facts and the assertion that because each time Carruesco previously encountered Anderson, he always was accompanied by East Side

Crips gang members. The People contend that it was therefore reasonable for Carruesco to assume that Anderson was with the East Side Crips on this occasion.

The People also argue, even if we find the stop of the car violated the Constitution, *Sanders* left intact the analysis of *Tyrell J.*, and the stop was thus justified by Hester's juvenile probation search condition.

We find nothing in either *Sanders* or *Pringle* that convinces us our original conclusions were incorrect. In fact, we find support in both cases.

In *Pringle*, the police made a lawful traffic stop and conducted a consensual search of the vehicle. Here, the stop was based on Carruesco's beliefs and, as established above, violated the Fourth Amendment. The general statements about probable cause in *Pringle* add nothing to our analysis.

Nor do the facts of *Pringle* and the cases discussed therein aid our analysis. In *Pringle*, the issue was whether the officer had probable cause to arrest Pringle when the illegal drugs found in the car could have belonged to any of the three occupants. Again, the drugs were found pursuant to a lawful stop and consent to search the vehicle.

In this case the issue was whether Carruesco and Heredia had a particularized and objective basis for suspecting the occupants of a lawfully operated vehicle of committing a crime, not whether there was probable cause to arrest the occupants. It is undisputed that once the officers observed the gun, they had probable cause to arrest the occupants. The unconstitutional stop of the vehicle, however, requires the observation of the gun and any subsequent information obtained as a result of the stop be suppressed.

*Ybarra* and *Di Re* are similarly inapposite. *Ybarra* addressed the right to search all patrons of a tavern when the search warrant was limited to the tavern and the bartender. *Di Re* addressed the arrest of all passengers in a vehicle when the arresting officer had particularized information that only one of the individuals in the car committed a crime. .

Carruesco had no *facts* that anyone in the car had committed a crime. Again, the issue is the stop of the vehicle, not the subsequent arrest.

Nor does *Sanders* provide any support for the People's argument. The People urge us to limit the holding of *Sanders* to its specific facts, a warrantless search of the residence of an adult parolee, combined with a lack of knowledge of the parole search condition.

To be sure, the opinion in *Sanders*, as well as the opinion in *Robles*, notes that the search of a home requires more stringent or different Fourth Amendment analysis. (*People v. Sanders, supra*, 31 Cal.4th at p. 324; *People v. Robles, supra*, 23 Cal.4th at pp. 798–800.) In fact, *Sanders* limited its holding to the unlawful search of an adult parolee. (*Sanders*, at p. 335.)

*Sanders*, however, implies that otherwise illegal detentions or searches will seldom be transformed into constitutionally permissible police action by the after-acquired knowledge that the subject was on parole or probation with a search condition. The Supreme Court focused on the purpose for the exclusionary rule and the requirement that the trial court evaluate the search based on what was known to the officer *at the time he or she acted. Sanders* also recognized that *Tyrell J.* departed from this traditional analysis and instead focused on the juvenile's expectation of privacy, a departure that has received substantial criticism. (*People v. Sanders, supra*, 31 Cal.4th at pp. 328–329.) Under the *Sanders* analysis, a parole or probation search condition unknown to the officer at the time he acted would not appear ever to justify a search or seizure, whether the subject of the search was walking on the street, the occupant of a vehicle, or in a residence. This is so because *Sanders*, and virtually every Fourth Amendment case that addresses the issue, requires the court reviewing the officer's conduct to analyze the issue based on the facts known to the officer at the time he acted. (*People v. Sanders, supra*, 31 Cal.4th at p. 332.) If the officer does not know the suspect is on parole or probation, then that fact should not be considered when performing a Fourth Amendment analysis.

Since the Fourth Amendment applies equally to searches of a residence (*People v. Sanders, supra*, 31 Cal.4th at p. 333), detentions of automobiles (*United States v. Cortez, supra*, 449 U.S. at p. 417), and detentions of individuals in a public place (*Terry v. Ohio* (1968) 392 U.S. 1, 8–9 [20 L.Ed.2d 889, 88 S.Ct. 1868]), the *Sanders* analysis should be used whenever a search or seizure implicates the Fourth Amendment. Such consistent application would implement the purpose of the exclusionary rule, which is meant " 'to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . .' " (*People v. Sanders, supra*, 31 Cal.4th at p. 324, quoting *United States v. Calandra* (1974) 414 U.S. 338, 347–348 [38 L.Ed.2d 561, 94 S.Ct. 613], fn. omitted.)

We are not the first court to address the effect of *Sanders. People v. Bowers* (2004) 117 Cal.App.4th 1261 [13 Cal.Rptr.3d 15] involved a defendant standing in front of a house when he was searched by an officer. The defendant was on adult probation, although the officer was unaware of the probation or of any search condition. The trial and appellate courts both originally

held the case was controlled by *Tyrell J.* and denied the defendant's motion to suppress. The Supreme Court granted review and remanded the matter to the appellate court after rendering its decision in *Sanders.*

The appellate court concluded that after the *Sanders* decision, the only basis for distinguishing *Sanders* from *Tyrell J.* was " 'the special needs' of the system applied to juvenile offenders." (*People v. Bowers, supra,* 117 Cal.App.4th at p. 1268.) "In every other respect, the Supreme Court's discussion of *Tyrell J.* throughout *Sanders* was clearly disapproving." (*Id.* at p. 1269.) The appellate court held that because the defendant was not on juvenile probation, *Sanders* compelled the conclusion that the search violated the defendant's Fourth Amendment rights because the officers did not know that the defendant was on probation at the time of the search. (*Ibid.*)

We are therefore faced with the task of applying the *Sanders* analysis in the face of the holding in *Tyrell J. Sanders* did not overrule *Tyrell J.* by noting that there may be unique considerations related to the juvenile justice system that would justify continued reliance on the right to privacy analysis of *Tyrell J.* when a juvenile probationer is involved. (*People v. Sanders, supra,* 31 Cal.4th at p. 335, fn. 5.) Nothing in *Sanders* suggests any other reason that would justify continued reliance on the right to privacy analysis.

The People have failed to identify any juvenile justice system consideration that would require this court to sanction police conduct that otherwise violates the Fourth Amendment. The Supreme Court in *Tyrell J.* concluded that the juvenile court's primary aim of rehabilitating juvenile offenders (Welf. & Inst. Code, § 202, subd. (b)) provided the basis for distinguishing juvenile offenders from adult offenders. (*In re Tyrell J., supra,* 8 Cal.4th at p. 87.) In the next sentence, however, the court stated that the purpose of imposing a search condition on a juvenile was to deter future misconduct by the juvenile. (*Ibid.*) This is the same purpose the Supreme Court found for imposing warrantless search conditions on adult offenders. (*People v. Sanders, supra,* 31 Cal.4th at p. 333, citing *People v. Reyes, supra,* 19 Cal.4th at p. 753.) Therefore, we cannot ascertain from *Tyrell J.* any special consideration of the juvenile justice system that would justify departure from the *Sanders* analysis.

In the absence of compelling reasons to treat individuals subject to the juvenile law differently than adults, we feel compelled by *Sanders* to limit *Tyrell J.* to its facts. To do otherwise would encourage police misconduct,

especially in a high-crime neighborhood, such as the one in this case. (*People v. Sanders, supra,* 31 Cal.4th at p. 328; *In re Tyrell J., supra,* 8 Cal.4th at p. 98 (dis. opn. of Kennard, J.).[9])

Unlike *Tyrell J.*, this case did not involve the stop of a juvenile in a public place. Instead, it involved the detention of a lawfully operated vehicle in which three adults and one juvenile were riding. The officers could identify only one of the occupants, and he was an adult. The officers did not know if any of the occupants of the Chevrolet were juveniles. Hester was an adult at the time of the stop. These facts distinguish this case from *Tyrell J.* The only similarity to *Tyrell J.* is that the officer who detained Hester did not know that he was subject to a juvenile probation search condition. This fact, standing alone, is insufficient, in our opinion, to overcome the compelling analysis in *Sanders.*

We conclude, therefore, that since applicable precedent holds that after-acquired knowledge of a probation search condition will not legalize otherwise unlawful conduct, the stop in this case violated the Fourth Amendment. To hold otherwise would contravene the purpose of the exclusionary rule and ignore the basic premise of Fourth Amendment analysis—what did the officer know at the time he acted?

## DISPOSITION

The judgment is reversed and the cause remanded to the superior court. The court is directed to vacate its order denying the motion to suppress and enter a new order granting the motion. The court is directed to vacate the guilty plea if Hester makes an appropriate motion within 30 days after the remittitur is issued. In that event, the superior court should reinstate the original charges and allegations contained in the information if the prosecution so moves. If Hester does not move to vacate the guilty plea, the trial court is directed to reinstate the original judgment.

Levy, J., concurred.

**BUCKLEY, Acting P. J.**—I respectfully dissent.

I must acknowledge that in the first opinion in this case prior to remand, I had concurred in the majority. However, upon a re-review of the facts and the applicable law, I am convinced I was wrong, as is the present majority.

---

[9] Justice Kennard also noted in her dissenting opinion that there was no significant distinction between juvenile offenders and adult offenders that would justify different treatment under the Fourth Amendment. (*In re Tyrell J., supra,* 8 Cal.4th at p. 96 (dis. opn. of Kennard, J.).)

Drawing from the facts as set forth by the majority and cognizant of certain additional and significant facts not set forth, I conclude there was a reasonable suspicion to detain the vehicle.

Officer Carruesco testified that he had contacted Leon Anderson on at least five occasions previously. On each occasion, he was in the company of admitted East Side Crips gang members. Moreover, he testified the driving pattern occurred for a distance of over one-half mile. Officer Heredia testified that he saw the three vehicles in a very tight formation criss-cross each other in the different lanes while maintaining their group.

It would appear obvious that the drivers (and occupants) of the vehicles knew each other and were driving in tandem. Given Officer Carruesco's expertise as a street gang expert, his familiarity with the East Side Crips and his knowledge of Anderson's proclivity to associate primarily, if not exclusively, with fellow gang members, it was certainly reasonable to assume the vehicles were carrying East Side Crips gang members.

With this reasonable assumption and the awareness that the East Side Crips would be armed for protection from retaliation by Country Boy Crips, the officers would have been remiss in failing to detain the vehicles to determine if the occupants were armed or at least the reason why they were driving in the manner in which they were. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur . . . ." (*Adams v. Williams* (1972) 407 U.S. 143, 145 [32 L.Ed.2d 612, 92 S.Ct. 1921] [a case involving detention of a person seated in an automobile based on information the detainee had a gun].) The Supreme Court further opined that a brief stop of a suspicious person, in order to determine his identity or to maintain the status quo momentarily, may be most reasonable in light of the facts known to the officer at that time. (*Id.* at p. 146.)

The majority sets forth a list of seven "inferences and deductions," presumably of the police officers, and then dissects the conclusions.

The majority acknowledges the first conclusion (that the vehicles were together) is "minimally supported" but then states that it was for such a short distance that the observations were really insufficient. I disagree. The manner in which the vehicles were proceeding, for a distance of over one-half mile leads to only one reasonable conclusion: They were together.

Next, the majority, singling out the identity of Leon Anderson, finds insufficient the conclusion that the other occupants in Anderson's vehicle were East Side Crips. The majority decision gives no credence to the

testimony of Carruesco that on every occasion (over five) in which contact had been made with Anderson, admitted East Side Crips were with him. Carruesco's testimony and expertise were unchallenged in the trial court. Accordingly, we are bound to accept it.

Likewise, it would be reasonable to conclude the occupants in the other two vehicles were fellow gang members.

While I would agree with the majority that there was no direct evidence to show that the vehicles' occupants had learned of the shooting six hours previously and therefore would neither expect retaliation nor be armed accordingly, it would be highly unlikely that a gang shooting in an adjacent neighborhood would not be common knowledge on the streets within hours, if not minutes, of the shooting.

In conclusion, given the circumstances, if the officers had not detained the vehicle and further gang violence were to have occurred, the officers would have been justifiably criticized by their superiors and/or the public. I would uphold the detention and affirm the conviction.

Respondent's petition for review by the Supreme Court was denied September 22, 2004. George, C. J., did not participate therein. Baxter, J., was of the opinion that the petition should be granted.