Filed 7/30/14  P. v. Martin CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B239366 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA072721) |
| v. | |
| TAAJ MARTIN et al., | |
| Defendants and Appellants. | |

Appeal from judgment of the Superior Court of Los Angeles County.  James R. Dabney, Judge.  Correction of abstract of judgment ordered; otherwise affirmed.

Janyce Keiko Imata Blair for Defendant and Appellant Taaj Zakee Martin.

David H. Goodwin for Defendant and Appellant Patrick Birdsong.

Richard D. Miggins for Defendant and Appellant Norman L. Cole.

Fay Arfa for Defendant and Appellant Sean A Mermer.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The four appellants appeal from their convictions for first degree murder and attempted premeditated murder; from findings that gang allegations are true, that a principal personally discharged a firearm that caused death; and from sentences imposed by the trial court following their convictions. We order correction of the abstract of judgment as to Cole, and otherwise affirm the judgment.

## Background[1]

**Murder of William McKillian**

On the morning of November 3, 2009, appellant Taaj Zakee Martin, a member of the Venice Shoreline Crips gang in the Venice area of Los Angeles, learned that his friend and fellow Venice Shoreline Crips gang member, William Charles McKillian, Jr., had been associating and regularly staying with Martin's ex-girlfriend, Raquel Miller, with whom Martin had broken up about a month earlier. Martin telephoned a female cousin of McKillian who lived next door to Miller, asking why she had not told him that McKillian and Miller had been "messin' around."

Sometime around 2:00 p.m. McKillian telephoned Martin on a cellphone borrowed from his cousin and was overheard saying "Hey, Cuz, where you at?" At about 3:30 p.m. McKillian again telephoned Martin on a phone borrowed from another cousin, apparently upset, saying "You told me to come down here. I'm here. Where are you?" McKillian returned the phone and walked toward the area of 7th and Broadway near Oakwood Park in Venice. A few minutes later, his cousin heard gunshots. McKillian was shot and killed in a nearby alley.

On a witness's tip, the police recovered the murder weapon from a dumpster a few doors away. They found no fingerprints on the gun, and the DNA they recovered from it could not be linked conclusively to Martin. A few witnesses testified, with various

---

[1] We state the relevant facts consistent with the applicable presumption favoring the judgment. (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [record viewed in light most favorable to judgment and presuming existence of every fact that could reasonably be deduced from the evidence].)

2

degrees of uncertainty, to their observations of a man of various descriptions looking into the dumpster, and running through the alley.

Soon after the killing, word spread among local residents and friends that Santa Monica 13, a "Mexican" street gang, was responsible for killing McKillian. McKillian's cousin, who had heard of the nearby shooting and knew that Martin and McKillian were close friends, texted Martin's phone from the site of the shooting about 15 minutes later, asking if he was okay; Martin's only response was "Why?"

**Murder of Richard Juarez and Attempted Murder of Richard De la Cruz**

Shortly before 9:00 p.m. on the evening of November 3, Richard Juarez and Richard De la Cruz had been sitting on a bench in Virginia Avenue Park in Santa Monica, with companions Chloe McCarty and Ashleigh Rodriguez. De la Cruz belonged to the Santa Monica 13 gang; Juarez belonged to a gang in another territory, but was associated with De la Cruz and the Santa Monica 13 gang. One or two African-American men approached the group, one wearing a hooded gray sweatshirt over a red striped shirt, the other a black sweatshirt; one had a black beanie hat. One man of the men fired several shots, killing Juarez.

Witnesses heard about eight or more gunshots, and multiple muzzle flashes were visible on the dashboard video recorder of a police car parked nearby on Pico Boulevard. After the shooting stopped, two men were seen running from the park, south across Pico Boulevard toward 22nd Street, one wearing a black sweatshirt, the other wearing a gray zip-up, hooded sweatshirt. One was wearing a black beanie cap.

A police officer who was parked nearby on Pico Boulevard heard the shots, saw the men running, and followed them in his car. When he turned onto 22nd Street he could no longer see the men he had followed, but saw a car parked with its headlights on. When the car pulled away as he shone his spotlight on it, the officer followed and stopped the car.

After a backup officer arrived he detained the driver and passenger, appellants Norman Lovan Cole and Sean Alex Mermer. About 10 minutes later a police dog pulled appellant Patrick Dwight Birdsong, Jr., from under a parked van in a residential backyard

3

on 22nd Street, near where Cole and Mermer had been parked. The police later found appellant Taaj Zakee Martin hiding under a tarp in a residential garage nearby on 21st Street. He was wearing a white T-shirt, jeans, red shoes, but no sweatshirt. The police found two abandoned handguns nearby, one with a silver barrel matching the description of the weapon used by one of the shooters. They also found a black beanie hat and a dark hooded sweatshirt in the corner of the yard, and a gray sweatshirt under a car parked on 21st Street. DNA testing linked the beanie cap and the black sweatshirt to Birdsong, with Mermer as a minor contributor to the DNA on the cap. Gunshot residue was found on Martin and Birdsong, indicated their recent contact with or close proximity to a gun that had been fired.

A search of the car revealed a cellphone registered to Martin, with DNA connecting Martin to it. Another phone found in the car was registered to Mermer's mother, at an address in Lancaster. Birdsong's fingerprints were on the Mermer phone, and on the car's front and rear passenger doors.

De la Cruz, Rodriguez, and McCarty were unable to identify any of the appellants.

**Charges Filed**

An information filed February 18, 2010, charged appellants Martin, Birdsong, Cole, and Mermer with the murder of Juarez (Pen. Code, § 187, subd. (a)), and with the attempted murders of De la Cruz, Rodriguez, and McCarty. (Penal Code, §§ 664, 187, subd. (a).)[2] It alleged that the offenses were committed for the benefit, at the direction of, and in association with a criminal street gang; that Martin and Birdsong personally and intentionally used and discharged a firearm, and discharged a firearm which caused Juarez's death, under section 12022.53, subdivisions (b), (c), and (d). Martin, Birdsong, and Cole were also charged with street terrorism. (§ 186.22, subd. (a).) A separate information filed seven months later charged Martin with McKillian's murder (§ 187, subd. (a)), and with the personal and intentional discharge of a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).) On November 4, 2010, the court ordered

---

[2] All statutory references are to the Penal Code except as otherwise specified.

the pleadings consolidated. An amended information filed December 1, 2010, added the McKillian murder charge as count 6 of the information.

**Verdicts and Sentences**

Following a six-week consolidated trial of Martin for the shooting of McKillian, and of all four appellants for the charges arising from the Virginia Avenue Park shootings, the jury acquitted Martin of the murder of McKillian. All four appellants were convicted of the first degree murder of Juarez, and the attempted premeditated murder of De la Cruz. Appellants Martin, Birdsong, and Cole were convicted of street terrorism. The jury acquitted appellants Cole and Mermer for the attempted premeditated murder of Rodriguez and McCarty, and was unable to reach a verdict on those charges as to Martin and Birdsong.

The jury found it to be untrue that Martin and Birdsong personally and intentionally discharged a firearm that caused Juarez's death. But as to each of the four defendants it found it to be true that a principal in the crime personally and intentionally discharged a firearm that caused Juarez's death, and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members.

The appellants were each sentenced for the murder of Juarez, to 25 years to life in prison, plus consecutive terms of 25 years to life for the firearm enhancements under section 12022.53, subdivisions (d) and (e), for total terms of 50 years to life in prison. For the attempted murder of De la Cruz, Martin and Birdsong were each sentenced to a consecutive term of life in prison, plus 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e), the sentence to run consecutively to their count 1 sentences. For the attempted murder convictions, Cole and Mermer were sentenced to life in prison plus 25 years to life, plus consecutive terms of 25 years to life for the firearm enhancements under section 12022.53, subdivisions (d) and (e), for total

5

terms of 50 years to life in prison, the count 2 sentences to run concurrently with their count 1 sentences.[3]

Timely notices of appeal were filed for each of the appellants.

## Discussion

The four appellants claim a large number of errors that require reversal or modification of their convictions and sentences. Their opening briefs together total more than 300 pages; their reply briefs add another 74 pages of argument. Each appellant has joined the others' claims to the extent applicable.

### I. Sufficiency of the Evidence To Support The Convictions.

The prosecution's theory was that the four appellants were members of the Venice Shoreline Crips street gang; that members of that gang believed (wrongly) that the rival Santa Monica 13 gang was responsible for killing McKillian, a fellow Venice Shoreline Crips gang member; that after McKillian's killing Martin (in Venice) communicated with Mermer (in the Lancaster area) by telephone; that Cole and Mermer then drove from Lancaster to Venice, picked up Martin in the Venice area, and drove Martin and Birdsong to the Virginia Avenue Park in Santa Monica 13 gang territory; that Martin and Birdsong approached and shot at the group in the park, killing Juarez and attempting to kill De la Cruz and their two companions, while Mermer and Cole waited in the car nearby; and that the four appellants committed the Virginia Avenue Park shooting for the benefit of the Venice Shoreline Crips gang, in retaliation for McKillian's murder earlier that day in Venice Shoreline Crips territory.

The appellants contend that the evidence is insufficient as a matter of law to support their convictions for the murder of Juarez, the attempted murder of De la Cruz, and street terrorism.

---

[3] The court struck allegations of prior convictions for Cole. The street terrorism sentences and the enhancements under section 12022.53, subdivisions (b) and (c), were stayed under section 654.

6

### A. Standards Of Review For Sufficiency Of The Evidence

The test in reviewing the sufficiency of evidence is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt, based on the entire record, viewed in the light most favorable to the judgment and presuming the existence of every fact that could reasonably be deduced from the evidence. (*People v. Hatch*, *supra*, Cal.4th 260, 272.) If the jury's determinations are supported by reasonable inferences from the evidence, the fact that the circumstances might have supported a contrary finding does not indicate that the findings are unsupported, and does not justify reversal of the resulting judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

One who aids, promotes, encourages, or facilitates the commission of a crime with the intent to do so is guilty as a principal in the crime, sharing the perpetrator's guilt as an aider and abettor. (*People v. Valdez* (2012) 55 Cal.4th 82, 146-147; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) It may be that mere presence at the scene is not alone sufficient to establish aiding and abetting (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409); but one who knowingly assists the crime's perpetrator by acting as a lookout or getaway driver can be guilty as an aider and abettor. (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743-744.)

### B. The Evidence Supports The Convictions Of Martin And Birdsong For The Murder Of Juarez And The Attempted Murder Of De La Cruz, And The Convictions Of Cole and Mermer As Aiders And Abettors In Those Crimes.

Martin and Birdsong were members of the Venice Shoreline Crips gang. After McKillian, a member of that gang, was shot and killed, rumors attributing the killing to members of Santa Monica 13, a rival gang, circulated among McKillian's family and fellow Venice Shoreline Crips gang members. A few hours later Juarez, De la Cruz, members or associates of the Santa Monica 13 gang, were sitting in Virginia Avenue Park when one or two African-American men approached, shooting multiple rounds from a silver-barreled gun and killing Juarez.

Two similarly dressed African-American men were then seen running across Pico Boulevard and south on 22nd Street, toward a car parked with its headlights on—which drove away when a police car turned the corner. Two African-American men—members of a historically rival gang to the Santa Monica 13 gang—were found hiding in a nearby backyard and garage, along with clothes matching the description of those worn by the shooters. DNA testing linked the beanie cap and the black sweatshirt to Birdsong, with Mermer as a minor contributor to the DNA on the cap. Gunshot residue was found on Martin and Birdsong, indicated their recent contact with or close proximity to a gun that had been fired. Two handguns were also found discarded nearby, one matching the silver-barrel gun described by one of Juarez's and De la Cruz's companions. In the car was a phone registered to Martin, and a phone bearing Birdsong's thumbprint. Telephone records for calls between the two phones found in the car driven by Mermer, during the time after McKillian was shot up to about 15 minutes before the Virginia Avenue Park shootings, indicated that Martin and Mermer had conversed by telephone shortly after the McKillian shooting, that Mermer and Cole had then driven from Lancaster to Venice, had picked up Martin in the Venice area, and had driven Martin and Birdsong to the Virginia Avenue Park shortly before the shooting at that location.

This evidence supports the jury's determinations that Martin and the others were aware of McKillian's killing and the rumors that the rival Santa Monica 13 gang was responsible, indicating a perceived motive to retaliate. It supports the determinations that after McKillian had been shot and before the Virginia Avenue Park shooting, Martin had communicated repeatedly with Mermer by telephone, and that Cole and Mermer had travelled to Venice to join Martin in retaliating against the Santa Monica 13 gang. It amply supports the jury's conclusion that Martin and Birdsong were active participants in the Virginia Avenue Park murder of Juarez and the attempted murder of De la Cruz, and that Cole and Mermer were aiders and abettors in those offenses.

The identification of Martin and Birdsong as the Virginia Avenue Park shooters is supported by the fact that after the shooting two men were seen running across Pico Boulevard to 22nd Street, that Birdsong and Martin were found hiding nearby bearing

8

gunshot residue, and that clothes and a gun matching those used by the shooters were found abandoned near where they were found hiding. Cole's and Mermer's participation as aiders and abettors is supported by the evidence that after the shooting they were waiting nearby in Mermer's car, across from the park on 22nd Street in the direction that the shooters had run, that they drove away when the police officer approached from around the corner, and that Martin's phone was in Mermer's car, along with Mermer's phone bearing Birdsong's thumbprint. These facts, which we must presume were believed by the jury, are amply sufficient to establish the elements of the murder and attempted murder for which the appellants were convicted, and the participation of all four appellants in the offenses. (*People v. Abilez*, *supra*, 41 Cal.4th at p. 504.)

### C. Substantial Evidence Supports the Firearm Enhancement Findings.

#### 1. Standard of Review

We review the sufficiency of the evidence to support the sentencing enhancements using the same standard that applies to a conviction of the substantive offense. (*People v. Loza* (2012) 207 Cal.App.4th 332, 347.) "'Whether the defendant . . . personally used a firearm [is a] factual question[] for the jury's determination. [Citation.] On appeal, ". . . the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v. Dominguez* (1995) 38 Cal.App.4th 410, 421.)

#### 2. Sufficient Evidence Supports The Findings That A Principal Discharged A Firearm That Killed Juarez.

Section 12022.53 establishes mandatory sentence enhancements for persons convicted of specified felonies, including murder, who discharge a firearm in the commission of the offense. (§ 12022.53, subds. (b)-(e).) Subdivision (d) of section 12022.53 mandates a consecutive 25-year-to-life enhancement for any person who personally and intentionally discharged a firearm causing death in the commission of one of the specified felonies. Subdivision (e)(1) of section 12022.53 imposes liability on an aider or abettor who committed the specified offense for the benefit of, at the direction of,

9

or in association with a criminal street gang. Section 12022.53, subdivisions (d) and (e)(1)(B), read together, require the imposition of a consecutive 25-year-to-life sentence enhancement when a defendant is convicted of murder for the benefit of a criminal street gang and any principal in the offense "personally and intentionally discharges a firearm" that causes death to any person other than an accomplice. (*People v. Hernandez* (2005) 134 Cal.App.4th 474, 480.)

Neither Cole nor Mermer was charged with having personally discharged the firearm that caused Juarez's death, and the jury found it not true that either Martin or Birdsong had fired that shot.

Appellants contend that the jury's "not true" findings with respect to Martin's and Birdsong's discharge of the firearm that resulted in Juarez's death amount to a determination that none of the principals personally and intentionally discharged a firearm proximately causing Juarez's death, as required for application of the enhancements under subdivision (d) of section 12022.53. "As there exists no shooter who is a principal in the murder of Juarez," they contend, "the jury's finding that appellant[s] vicariously shot a gun during the commission of Juarez' murder within the meaning of Penal Code section 12022.53, subdivision (e)(1), is unsupported by substantial evidence."

The appellants' theory suffers from a fatal defect: The jury affirmatively found that a principal in the offense personally and intentionally discharged the handgun that killed Juarez. Like the determinations of the appellants' guilt of the offenses of murder and attempted murder, the "true" finding for the section 12022.53 enhancements require proof beyond a reasonable doubt. (*People v. Loza*, *supra*, 207 Cal.App.4th 332.) Therefore we must presume that the jury found beyond a reasonable doubt that *some* principal in the offense—either Martin, or Birdsong, or both—discharged a handgun, but that it had some reasonable doubt as to *which one of them* did the actual shooting. The fact that the jury was unable to identify the actual shooter does not constitute an affirmative determination that neither of them fired that shot. It does not negate the jury's affirmative determination that a principal in the offense personally and

10

intentionally discharged the handgun that killed Juarez, notwithstanding that the evidence was not sufficient to identify *which* of the appellants was the shooter.

For this reason the appellants' reliance on *People v. Camino* (2010) 188 Cal.App.4th 1359, is misplaced. In that case the defendant and his fellow gang member Palacios were involved in a gunfight with a rival gang, in which Palacio was shot and killed. Because the only shooter in Camino's gang was Palacio, the court concluded that the elements of section 12022.53, subdivision (e)(1), could not be satisfied. Palacio could not be a principal or an accomplice in his own murder; therefore Camino could not be an accomplice to a murder in which a principal had used a gun. (*People v. Camino*, *supra*, 188 Cal.App.4th at pp. 1380-1381.) "As there exists no shooter in defendant's group who is (or was) a principal in the offense charged in count 1, the jury's finding that defendant vicariously shot a gun during the commission of Palacios's murder is unsupported by substantial evidence." (*Id.* at p. 1381.)

Our case is different. In our case, there is evidence of more than one shooter, and that all the shooters were members of the Venice Shoreline Crips gang. Nor were the victims of the shooting the defendants' accomplices. It therefore is not necessarily true here, as it was in *People v. Camino*, *supra*, that "there exists no shooter in defendant's group who is (or was) a principal in the offense." Nothing in the evidence or in the jury's verdicts precludes the possibility that either Martin or Birdsong (or both) might have been the shooter or shooters, though the jury was unable to determine beyond a reasonable doubt which it was. The jury was entitled to find from the evidence that a shooter in the defendants' group was a principal in the offense who fired a handgun, without identifying who that shooter was. The findings that each of the defendants was an accomplice to the shooting therefore are fully supported.

There is no requirement that the principal who intentionally and personally discharged the firearm must be convicted of the offense, or even that he or she must be identified. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1173 ["the absence of a shooter's

11

conviction is not dispositive of the aider and abettor's exposure to liability"].)[4]  In order to find an aider and abettor subject to the sentence enhancements of section 12022.53, the aider and abettor must be convicted of the underlying offense (i.e., the murder of Juarez); but there is no requirement that the principal who intentionally and personally discharged the firearm must be convicted of the offense.  (*People v. Garcia*, *supra*, 28 Cal.4th at p. 1174.)

The evidence is sufficient to support the determinations that a principal in the murder (either Martin or Birdsong) fired the shot that killed Juarez, and that the three other appellants are vicariously liable for that offense and are therefore subject to the sentence enhancements.  The fact that the jury could not determine which of the appellants was the actual shooter does not render inconsistent or unsupported the findings that one of the appellants shot and killed Juarez, and does not vitiate the sufficiency of the evidence to support their convictions and sentence enhancements for having done so.

---

[4] "[I]n order to find an aider and abettor—who is not the shooter—liable under section 12022.53, subdivision (d), the prosecution must plead and prove that (1) a principal committed an offense enumerated in section 12022.53, subdivision (a), section 246, or section 12034, subdivision (c) or (d); (2) a principal intentionally and personally discharged a firearm and proximately caused great bodily injury or death to any person other than an accomplice during the commission of the offense; (3) the aider and abettor was a principal in the offense; and (4) the offense was committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' (§§ 186.22, subd. (b)(1) & (4), 12022.53, subd. (e)(1).)  Although the aider and abettor must first be convicted of the underlying offense before the enhancement may apply [citation], the prosecution need not plead and prove the *conviction* of the offense by the principal who intentionally and personally discharged a firearm." (*People v. Garcia*, *supra*, 28 Cal.4th at p. 1174.)

## II. The Evidence Supports The Gang Enhancement Findings.

### A. The Trial Court Did Not Err In Admitting The Testimony Of Gang Expert Gomez.

#### 1. The gang expert's testimony was supported by substantial evidence.

The prosecution presented the testimony of Angel Gomez, a Los Angeles Police Officer assigned to the Pacific Gang Enforcement Detail, testifying as an expert on street gangs in the relevant area, and specifically the Venice Shoreline Crips gang. After reviewing evidence of gang affiliations (including reported police observations, tattoos, history of associations and locations, and the like), Gomez testified to his opinion that each of the four defendants was a member of the Venice Shoreline Crips gang. The appellants contend that the court erred in permitting Gomez to testify that certain hypothetical facts indicate that the Virginia Avenue Park shooting was done in association with and for the benefit of the Venice Shoreline Crips gang, and that the testimony prejudicially permitted the jury to find them guilty of acts subjecting them to gang sentence enhancements. (§ 12022.53, subd. (e)(1).)

Gomez was asked to assume, hypothetically, that a member of gang A is killed within his own gang's territory; that members of gang A believe members of gang B are responsible for the killing; and that soon afterward members of gang A commit a shooting and killing in gang B's territory. Gomez was then asked for his opinion, based on those hypothetical facts, "whether that second shooting, the killing in Gang B's territory, would have been committed at the direction of, in association with, or for the benefit of Gang A." He responded that "obviously it would be in association within that gang if you have numerous individuals that would go and commit this shooting against Gang B"; and that "there are a number of ways it would benefit that gang." Gomez went on to explain that the second shooting in retaliation for a shooting by another gang would solidify and enhance gang A's reputation within its territory and within the gang community; that the status of the participating gang members within their own gang— and especially the status of those who took part in the actual shooting—would be greatly enhanced by the retaliatory shooting; and that the shooting would facilitate criminal

13

conduct by gang A by enhancing its reputation for violence and retaliation, thereby dissuading others from reporting or identifying criminal conduct by members of that gang.

Appellants contend that this hypothetical question to Gomez called for an opinion without adequate foundation, and that they were prejudiced because it elicited testimony suggesting a motive for the shooting, the identity of the shooters, and a basis for resolving the gang enhancement allegations. They argue that the theory that members of Venice Shoreline Crips shot at Juarez and De la Cruz in retaliation for McKillian's murder in Venice Shoreline Crips territory rests only on speculation. This is shown, they argue, by the facts that the rumors that Santa Monica 13 gang members were responsible for McKillian's killing are unsupported by admissible evidence, and that the prosecution had charged Martin—a Venice Shoreline Crips gang member, not a Santa Monica 13 gang member—with McKillian's killing. "There was, in short, no credible evidence that Venice Shoreline had committed the Virginia Park shooting . . . ."

These are arguments that the defense could use—and did use—in urging the jury to reject the prosecution's theory of the case. But to little avail, for the jury nevertheless found that the evidence supports the verdicts. The appellants' contentions do not compel any contrary conclusion.

It is true that there is no reliable evidence that the Santa Monica 13 gang was responsible for McKillian's murder, despite the contrary rumors. But that does not render the gang-expert's testimony speculative. Gomez's opinions rested on the evidence that the Venice Shoreline Crips members *believed* the Santa Monica 13 gang was responsible for McKillian's murder, notwithstanding the absence of any solid foundation for that belief. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655-656 [rumor that fellow gang member was killed by rival gang member was admissible to explain defendant's motive for retaliatory killing of rival gang member, without regard to truth or falsity of rumor].)

Gomez's opinion was that gang A's members' killing of rival gang B's members, believed to be done in retaliation for an earlier killing of a gang A member by a member

14

of gang B, would apparently be for the benefit of gang A rather than merely for the personal benefit of the killing's participants. Ample evidence supports each of the assumed facts. There was evidence that the participants in the Virginia Avenue Park shooting were members of the Venice Shoreline Crips gang, and that it was done in retaliation for what they believed to have been the killing of a Venice Shoreline Crips gang member by Santa Monica 13 gang members. The gang expert's opinion was not based on speculation, and there was no error in admitting that testimony.

**2. The gang expert provided sufficient evidence of the Venice Shoreline Crips gang's primary activities.**

Appellant Mermer contends that the prosecution failed to satisfy its obligation to establish the Venice Shoreline Crips gang's primary activities. The contention lacks merit.

The appellants were found to have been engaged in street gang activity, an element of which is proof of their membership or affiliation with a criminal street gang that has "as one of its primary activities the commission of one or more" enumerated criminal acts. (§ 186.22, subd. (f).) The enumerated acts include the commission or attempt to commit assault with a deadly weapon, robbery, murder, narcotics sales, and felony vandalism. (§ 186.22, subd. (e).)

Officer Gomez testified that the primary activities of the Venice Shoreline Crips gang included vandalism, sale of rock cocaine, robbery, assault with a deadly weapon, and murder. That testimony supplies substantial evidence to satisfy the primary activity element of the section 186.22 offense. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 [testimony of gang expert, based on conversations with gang members, personal investigation of gang members' crimes, and information from colleagues, "may be sufficient to prove gang's primary activities"].)

### 3. The evidence supports the determinations that the crimes were committed for the benefit of or in association with a criminal street gang.

The jury found the allegations that appellants committed the offenses of murder and attempted murder "for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members," to be true. These findings constitute the grounds provided in subdivisions (d) and (e)(1) of section 12022.53, for the imposition of gang-related sentence enhancements under section 186.22, subdivision (b). Appellants challenge these sentence enhancements, contending that the evidence is insufficient to support these findings.

They cite *People v. Martinez* (2004) 116 Cal.App.4th 753, 762, for the proposition that in order to satisfy the requirements of section 186.22, subdivision (b), "the record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang." (*Id.* at p. 762, italics omitted.) However, in the more recent case of *People v. Albillar* (2010) 51 Cal.4th 47, the Supreme Court held that "a violation of section 186.22(a) is established when a defendant actively participates in a criminal street gang with knowledge that the gang's members engage or have engaged in a pattern of criminal activity, and willfully promotes, furthers, or assists in *any* felonious criminal conduct by gang members." (*Id.* at p. 54.) "In sum, if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.)

The appellants' convictions do not in any event suffer from the defect found in *People v. Martinez*, *supra*. Here, the evidence went beyond the fact that the participants in the Virginia Avenue Park shooting were members of or closely associated with the Venice Shoreline Crips gang. The circumstances surrounding McKillian's killing

16

provide substantial evidence of a Venice Shoreline Crips gang-related motive for the Virginia Avenue Park shooting—retaliation for the Santa Monica 13 gang's perceived involvement with the McKillian killing. That evidence, if credited by the jury (as we presume it was), justifies a conclusion that the Virginia Avenue Park shooting, carried out by Venice Shoreline Crips members and their close associates shortly after the McKillian killing, was a gang-motivated offense. That evidence constitutes substantial evidence, apart from the participants' gang affiliations, that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang.

## III. The Trial Court Did Not Err In Refusing The Defendants' Bifurcation Requests.

### A. The Trial Court Did Not Err In Refusing To Bifurcate The Gang Enhancements From The Substantive Charges.

Appellant Mermer contends that he was deprived of his constitutional rights to a fair trial and due process by the trial court's denial of his request to bifurcate the gang enhancement allegations from his trial on the substantive charges. We conclude that the trial court acted within its discretion in refusing the bifurcation request. (*People v. Hernandez* (2004) 33 Cal.4th 1040 [denial of motion to bifurcate gang allegations from trial on substantive offenses is reviewed for abuse of discretion].)

In *People v. Calderon* (1994) 9 Cal.4th 69, the Supreme Court held that the trial court has discretion to bifurcate "the determination of the truth of an alleged prior conviction from the determination of the defendant's guilt of the charged offense . . . ." (*Id.* at p. 72.) In *People v. Hernandez*, *supra*, 33 Cal.4th 1040, however, the court held that there generally is less need for a bifurcation of gang enhancement allegations than there is for a prior conviction allegation. That is in part because the gang enhancement allegations ordinarily relate to the facts of the charged offense and are determined by the jury at the same time as the guilt determination. (*Id.* at pp. 1048-1049.) Evidence of gang membership and affiliation, including evidence of the gang's territory, membership, beliefs and practices, criminal enterprises, and rivalries, can be used to prove identity,

17

motive, specific intent, or other issues pertinent to guilt of the charged crime. (*Id.* at p. 1049.)

To the extent the evidence supporting the gang enhancement would be admissible in the trial of the underlying offenses, bifurcation would be unnecessary, and no prejudice could result from its denial. (*People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049-1050.) Bifurcation is required only when the defendant can "'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'" (*Id.* at p. 1050.)

The appellants have made no such showing. They have identified no evidence that was admissible in the trial only by virtue of the gang enhancement allegations, but would have been inadmissible to establish the appellants' guilt of the substantive offenses. The evidence of gang involvement and activity was central to the prosecution's proof of the appellants' motive for the Virginia Avenue Park shooting. For that reason, bifurcation of the gang enhancement allegations would have afforded the appellants little or no benefit. It could not have prevented the evidence of their gang involvement and motives from reaching the jury during their trial on the substantive charges. The trial court did not err in refusing to bifurcate the gang enhancement allegations from the appellants' trial on the substantive charges, and in any event the appellants suffered no prejudice from the challenged ruling.

## B. The Trial Court Did Not Err In Refusing To Sever Martin's Trial For McKillian's Murder.

On September 14, 2010, about seven months after the filing of the charges based on the Virginia Avenue Park shooting, the prosecution filed an information charging Martin with the murder of McKillian. Two weeks later, the prosecution moved to consolidate its newly filed case against Martin with the earlier-filed charges against the four appellants arising from the Virginia Avenue Park shooting. The appellants all moved before trial to sever the consolidated cases—Birdsong, Cole, and Mermer on the ground that they would be prejudiced by the evidence relating to the McKillian killing, with which they had no involvement; and Martin on the ground that he would be

prejudiced in his trial for the McKillian killing by the gang-related evidence that would be applicable only to the Virginia Avenue Park shooting.[5]

The trial court denied the motions to sever. It found that the McKillian murder and the Virginia Avenue Park shooting are offenses of the same class, that they are factually interrelated in that one was allegedly the motive for the other, and that Birdsong, Cole, and Mermer would not be prejudiced by the evidence relating to the McKillian murder, in which they were not claimed to have been involved.

Trial courts have discretion under section 954 to consolidate and try together multiple counts relating to "the same class of crimes or offenses," or to offenses "connected together in their commission" (§ 954), and they should be tried jointly in the absence of a "clear showing of prejudice." (*People v. Jones* (2013) 57 Cal.4th 899, 925.) Here, the appellants were all charged with murder and attempted murder in the Virginia Avenue Park shooting, crimes of the same class as the charge against Martin for the murder of McKillian. (§ 954.) Evidence of the McKillian murder would have been admissible even in a separate trial of the Virginia Avenue Park shooting charges, because the defendants' belief that the Santa Monica 13 gang was responsible for the McKillian killing was alleged to be their motive for the Virginia Avenue Park shooting. Moreover, there is nothing about the McKillian killing that would tend to inflame the jury against the three appellants who were not charged with involvement with it. Finally, the jury's acquittal of Martin for the McKillian murder, and its acquittal of Cole and Mermer for the attempted murder of Juarez's and De la Cruz's companions, indicates that it was fully willing to separately consider the evidence relating to each of the defendants and each of the charges. The trial court did not abuse its discretion by denying the defendants' motions to sever the trial of Martin for the McKillian murder from those of Birdsong, Cole, and Mermer arising from the Virginia Avenue Park shooting.

---

[5] We need not consider Martin's argument that he would be prejudiced in his trial for the McKillian murder, because the jury acquitted him of that charge.

19

## IV. Alleged Errors With Respect To Admission and Exclusion of Evidence.

### A. The Trial Court Did Not Err In Admitting Expert Testimony Concerning The Defendants' Cellphone Use.

Mermer contends that he was deprived of due process and a fair trial by the trial court's erroneous admission of expert testimony of a telephone company custodian of records, rather than that of an engineer, concerning the information that can be gleaned from the telephone company records produced to the police. The other appellants join in that contention. We find no error in the admission of the challenged testimony.

#### 1. Standard of review for admission of expert opinion.

A person is qualified to testify as an expert if he or she has special knowledge, skill, experience, training or education sufficient to qualify him or her as an expert on the subject to which his or her testimony relates. (Evid. Code, § 720, subd. (a).) The trial court has broad discretion to determine an expert's qualifications to testify, and its ruling will not be disturbed on appeal without a manifest showing of abuse of discretion. A reviewing court may find error only if the witness clearly lacks qualification as an expert. (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1377; *People v. Kelly* (1976) 17 Cal.3d 24, 39.)

#### 2. The testimony of the custodian of Sprint telephone records was not beyond his expertise, and its admission did not abuse the trial court's discretion.

Ricardo Leal, a "subpoena analyst" for Sprint Nextel telephone company, testified concerning the contents of telephone records produced by Sprint under subpoena, relating to calls between the cellular telephones registered to Martin and to Mermer's mother. Over objections to the adequacy of Leal's qualifications and the foundation for his testimony, Leal was permitted to testify to the nature of the information that can and cannot be determined from the subpoenaed records. The prosecution argued that the information provided by the telephone records, as explained by Leal, constitutes strong circumstantial evidence supporting the charges against all the defendants. It shows, the prosecution contends, that Martin (in Venice) and Mermer (in Lancaster) had conversed

20

by telephone shortly after the McKillian shooting, that Mermer and Cole had then driven from Lancaster to Venice, had picked up Martin in the Venice area, and had taken Martin and Birdsong to the Virginia Avenue Park shortly before the shooting at that location.

Leal testified that he had been a Sprint subpoena compliance analyst for eight years, that he had received on-the-job training concerning how to interpret Sprint's telephone records for law enforcement, that he had been trained about how Sprint's records are generated and maintained, and that he had testified in court on these subjects about 15 times. He was then asked to explain the information collected by Sprint and provided in response to a subpoena.

Leal testified, for example, that the records show the number making the call; the date, time, and duration of the call; whether the call was inbound or outbound from the subscribing phone; whether the call was answered or sent to voicemail; and the locations of the towers from which the call was originated and terminated. He explained that the originating and terminating towers are usually, but not necessarily, those that are then closest to the originating and receiving phones, and some of the factors (such as distance, terrain, and density of cellphone usage) that affects whether the call is routed to the closest tower. And he explained how a call is sometimes handed off from one tower to another, usually due to changes in the telephone's location during the call. He explained also how the location of the towers can be identified and determined from maps provided by Sprint.

The defendants objected to the foundation for Leal's testimony, based on his admitted lack of technical expertise as an engineer and his inability to explain how calls are routed beyond what he had been taught by Sprint. They argued that Leal was qualified to do no more than identify the records he had brought, and "as far as what this line [in the records] says, the records speak for themselves." "He cannot testify to what towers they came off of. That is for an expert to interpret, not him." The trial court overruled the objections.

Leal then testified to the information on the records he had produced, concerning the cellphone registered to Martin, and the phone registered to Mermer's mother in

21

Lancaster, which had been found in Mermer's car after the shooting. Following Leal's direct testimony, the defendants examined him at length—and without limitation—about the meaning of his testimony and the information in the records he had provided, as well as the limits of his training and expertise.[6]

The appellants have failed to identify any basis for their contention that Leal's testimony was inadmissible, or that its admission into evidence denied them a fair trial. It is true, as they complain, that his testimony tended to tie the appellants geographically to the crime by showing the calls between Martin's and Mermer's cellphones near the time of the shooting, and the approximate locations of the phones at the time of each call. Yet the appellants have failed to demonstrate the unfairness and prejudice they claim.

Leal readily admitted that the cellphone records show only a range of locations, depending on a number of possible factors, and that they do not show the phones' exact locations during the hours before the shooting. Yet appellants do not identify any way in which the records' admitted lack of absolute precision with respect to the location of each cellphone prejudiced them, or how a witness with greater technical expertise would have been able to supply additional precision. Nor is it clear that an engineer trained in the technology of cellphone transmissions would have had the expertise to testify, as Leal did, about the information shown on Sprint's call records.

It is undoubtedly true (as the appellants' counsel argued in the trial court) that a hospital's custodian of records cannot testify as a doctor about the medical necessity or success of a procedure reflected in the hospital's records; but that is not the point. A hospital's custodian of records might be qualified to explain what the hospital's records

---

[6] The court explained its rulings: "I totally disagree with the fact that he has to understand the science. He's here to testify about the records. He's been given some rudimentary training on how these things generally operate, not the science behind them as to how these reports are generated. And for that reason I've allowed him to testify on this stuff.

"If the issue here is going to be whether or not this particular tower—how scientifically it really actually works, then this guy would not be able to do it. But what he's telling me, this record indicates it was on this tower on this date. And you know, he's already laid that foundation for the records at this point, so let's move on."

reflect as to when, by whom, and for what fee a particular procedure was done, while a doctor might not. Leal could not have testified to the technology of the cellular telephone system's routing of calls, but it was well within his training and expertise to explain what the telephone company records do and do not show concerning the locations of the cellular towers to which calls had been routed, and the times and durations of those calls. There was no abuse of discretion in permitting him to provide that testimony.

**B. The Trial Court Did Not Err In Refusing To Suppress Evidence Of The Items Seized From Mermer's Car Following The Virginia Avenue Park Shooting.**

Appellant Mermer contends that his constitutional right to freedom from unlawful search and seizure was violated when his car was stopped by the police shortly after the Virginia Avenue Park shooting, that the police had no probable cause to detain him or to search his car, that his detention constituted an unlawful arrest, and that the police had no probable cause to arrest him or to search his car without a warrant.[7] His contentions have no merit.

A pretrial hearing on Mermer's motion to suppress elicited the following testimony: On the evening of November 3, 2009, Officer Michael Federico was sitting in his parked patrol car on Pico Boulevard within a block of the Virginia Avenue Park, typing on his computer, when he heard gunshots from the park. He pulled his car forward and saw two Black or Hispanic men run from the park about one-half block ahead of him, south across Pico Boulevard and down 22nd Street. One wore a black hooded sweatshirt and shorts, the other wore a gray or blue hooded sweatshirt.

After looking around the corner, Federico turned and followed the men south on 22nd Street. As he turned onto 22nd Street with his spotlight on, a car that had been parked on the west side of the street with its lights on, pulled quickly away from the curb. He followed the car in the belief that the two running men might be inside the car, and he

---

[7] The other appellants' attempt to join in these contentions is to no avail. They lack standing to challenge the detention and search of Mermer or of his car. (*People v. Turner* (1994) 8 Cal.4th 137, 183, fn. 8; *In re Lance W.* (1985) 37 Cal.3d 873, 881.)

radioed for officers to assist him with a stop. The car pulled over and stopped about a block later in response to his police vehicle's overhead lights.

When backup officers arrived a minute or two later, Federico approached the car and spoke with Mermer, who was driving. Federico did not then believe that Mermer and Cole were the men he had seen running from the park, but he was concerned that the car might be a getaway vehicle for the running suspects. In response to questions, Mermer said he was coming from Lancaster, but he stumbled on his words in explaining where he was going, saying that he was not sure, that he did not know what happened back at the park (indicating that he had heard the gunshots and was at least a potential witness to a crime), and that he was going to drop Cole off at an address in Venice. Federico found these responses to be inconsistent with the car's location and suspicious. He had heard earlier in the day about a Venice gang shooting that was being blamed on Santa Monica gang members; and the car had been parked on a dark residential street, not on any plausible route from Lancaster to Venice.

Federico ordered Cole and Mermer out of the car, telling them that they were being detained, not arrested, while the police investigated. They were handcuffed and told to sit on the curb. During that time Federico heard a radio report of someone hiding in the backyard of a residence near where Mermer's car had been parked. With that information the police set up a perimeter in the neighborhood.

The police then opened the back doors and rear hatch of Mermer's car to determine whether anyone else was hiding in it. Having learned by then that the shooting at the park involved a homicide, the officers also searched the car for weapons. About 10 minutes into Cole's and Mermer's detention, Federico heard on the radio that a suspect had been found in a yard on 22nd Street near where he had first seen the car parked. Martin was found some hours later, hiding under a plastic tarp in a garage on 21st Street.

The trial court found the initial stop of Mermer's car and detention of Mermer and Cole to be supported by Federico's reasonable suspicion after he had heard the gunshots, observed the two men running down 22nd Street, and saw the car pull away from the curb where he had seen the two men running. It held the arrest of Mermer and Cole and

24

the search of the car to be supported by probable cause, based on these facts and supplemented by the developing information concerning Birdsong having been found hiding, and Mermer's and Cole's improbable and inconsistent explanations.

The Fourth Amendment to the federal Constitution prohibits the state's use of unreasonable searches or seizures. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.) Federal constitutional standards govern the proof required to support searches and seizures in California. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1158.) "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The trial court's express and implied factual determinations are entitled to deference when they are supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673.) However, on appeal the reviewing court independently determines whether the facts found by the trial court are sufficient to qualify as a legal detention, arrest, and search. (*People v. Lomax* (2010) 49 Cal.4th 530, 563.) An investigative stop, such as the one conducted by Federico, is valid if "the circumstances known or apparent to the officer . . . include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893.)

The evidence in this case fully satisfies the requirements that the police stop of Mermer's car, the detention and arrest of Mermer and Cole, and the search of Mermer's car must be reasonable under the circumstances. (*People v. Hernandez*, *supra*, 45 Cal.4th at p. 299; *People v. Wells* (2006) 38 Cal.4th 1078, 1083 [detention requires specific facts—more than a hunch—manifesting possibility that person detained may be involved in criminal activity].) The gunshots in the park, two men running toward the waiting car, and the car pulling away and driving down 22nd Street when Federico observed them in his spotlight, constitute objective indications of criminal activity that justify a reasonable

suspicion that the car's occupants might be involved.  The evidence therefore supports the trial court's ruling that the initial stop and detention were justified.

The evidence also supports the trial court's determination that the police were justified in later arresting Cole and Mermer, and searching Mermer's car.  By the time Cole and Mermer were placed under arrest, the events that had justified the initial stop and detention remained reasonably suspicious, and additional identifiable factors added objective justification for the police actions.  At least one of the suspected shooters had by then been found hiding near where the car had apparently been waiting during the shooting and until the suspected shooters ran toward it, giving reasonable cause to believe that the car might contain evidence connecting it and its occupants to the suspected shooter found nearby.  The trial court did not err in refusing to suppress the evidence obtained from Mermer's arrest and the search of his car.

Mermer's reliance on various cases that have found evidence to be insufficient to support findings of reasonable or probable cause is misplaced.  In *In re Tony C.*, *supra*, 21 Cal.3d 888, for example, the police officer's observation that "juveniles do commit crimes when they are supposed to be in school and they're not" did not constitute reasonable suspicion that a crime had been committed or reasonable cause to detain the defendant, even though the officer had been told of earlier burglaries in the area.  "A day-old burglary report does not transform a residential neighborhood into a no man's land in which any passerby is fair game for a roving police interrogation . . . ." (*Id.* at p. 897.)  But our case is different.  The evidence recounted above shows there was much more to arouse police suspicions than just the appellants' unexplained presence—including likely criminal activity evidence by the gunshots moments earlier, the suspects running toward Mermer's car, with its lights on, the car suddenly pulling away from the curb as Federico's spotlight illuminated it, and the occupants' unlikely and inconsistent explanations of their presence and destination.

Similarly, in *People v. Hester* (2004) 119 Cal.App.4th 376, 383-384, 392, the court found no probable cause to stop and detain a car containing Black males, one of whom was a member of a local gang that was a rival of another gang whose member had

earlier in the day been shot. The police were not entitled to assume that everyone that might associate with a gang member is also involved in gang activities, or that every member of a rival gang is armed for possible retaliation to a gang-related event. All the officer knew when he stopped the car was that "the occupants *may* be armed because they *may* be expecting retaliation because they *may* be gang members and they *may* have heard that there was a shooting in [a local park] some six hours earlier." (*Id.* at p. 389.) But here, too, our case is different. The gunshots had been heard moments—not hours—earlier, and the stop and detention occurred in the immediate area. Moments after the gunshots, Federico saw two men running from the park, toward Mermer's car, which was positioned as a getaway car might be, parked with its headlights on, facing away from the park from which the gunshots had come, on a dark residential street. When Federico's spotlight illuminated the car, he could no longer see the running men but the car quickly pulled away from the curb. These circumstances are unlike the generalized suspicions that were found to be insufficient in *People v. Hester.* They provided Federico with objectively reasonable grounds to believe that the car's occupants might be involved in some manner with the gunshots and the running suspects he had seen moments earlier. His initial conversation with Mermer confirmed that Mermer was aware of the gunshots in the park, and also gave him reasonable doubts about Mermer's explanation of his presence near the scene of the apparent crime. (See *People v. Memro* (1995) 11 Cal.4th 786, 842 [inconsistent statements indicate consciousness of guilt, supporting finding of probable cause to arrest]; *People v. Garcia* (1981) 121 Cal.App.3d 239, 246 [inconsistent statements support probable cause].) And the developing information that Federico learned during the detention, about suspects hiding in the area, provided additional grounds for his suspicions. Here, unlike in each of the cited cases, the officer had specific and articulable facts to support a reasonable suspicion that Cole, Mermer, and the car they were driving, might be connected in some way to criminal activity.[8]

---

[8] In *People v. Durazo* (2004) 124 Cal.App.4th 728, 732-733, the court found the defendant's detention insufficiently supported, where it was based on the fact that the defendant and his passenger were young Hispanic males who had looked in the direction

A warrantless search of a vehicle is valid when the police have probable cause to believe that a vehicle that is lawfully detained contains evidence of criminal activity or contraband. (*People v. Evans* (2011) 200 Cal.App.4th 735, 753.) In that case, probable cause to search the car was lacking because the criminal activity for which the defendant was arrested consisted of the arrestee's refusal to cooperate with the officers once he was already outside the car. Here, the suspects in the park shooting had been seen running toward Mermer's waiting car when they disappeared from Federico's view, and by the time the car was searched, one of the suspects had been found hiding nearby. These facts, and their physical and temporal proximity to the shootings, provided Federico with probable cause to believe that the car would contain evidence of the nearby criminal activity.

The specific facts articulated by Federico supported his suspicion that Mermer's car and its occupants might be involved with the nearby gunshots he had heard. The court did not err by refusing to suppress the fruits of Mermer's detention and arrest, and the search of his car.

## C. The Trial Court Did Not Err In Finding De la Cruz Unavailable To Testify At Trial, And Admitting Evidence Of His Preliminary Hearing Testimony.

Criminal defendants have a right under the state and federal Constitutions to confront the witnesses against them. (*People v. Herrera* (2010) 49 Cal.4th 613, 620.) If the witness is unavailable to testify at trial and has given prior recorded testimony in which the defendant had an opportunity to cross-examine the witness, the prior testimony

---

of an apartment complex at the approximate time of morning that a resident of the complex had claimed that Mexican gang members had four days earlier threatened to attack him. No crime had occurred at or near that time, and the defendant's "glance" at the apartment complex was not enough. The officer's "self-described 'gut' feeling lacked the requisite objective showing" to justify the detention. (*Id.* at p. 737; see *People v. Perrusquia* (2007) 150 Cal.App.4th 228, 234 [defendant's presence in car idling in parking lot of open convenience store, without evidence of any present or intended criminal activity or defendant's involvement with it, does not satisfy requirement for specific and articulable facts supporting officer's suspicion].)

28

may be admitted at the defendant's trial. (Evid. Code, § 1291, subd. (a)(2); *People v. Cogswell* (2010) 48 Cal.4th 467, 477.) It is the prosecutions burden to establish that the witness is unavailable to testify. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1296.)[9]

Seeking to have De la Cruz testify at the appellants' trial, the prosecution served him with a subpoena six days before the trial's August 9, 2011 commencement. However, when the time came for him to appear, he did not. The court then issued a body attachment for him, and on August 31, 2011 and September 8, 2011, the prosecution presented evidence, out of the jury's presence, concerning the unsuccessful efforts to obtain his presence at trial.

At the August 31, 2011 due diligence hearing, Santa Monica Police Officer Ahn testified that on August 3, 2011, at De la Cruz's residence in the presence of his mother and step-brother Richard Espandola, he had served De la Cruz with a subpoena to appear on August 9. Ahn had spoken with De la Cruz once or twice since his preliminary hearing testimony. When he served De la Cruz with the subpoena, he told De la Cruz of the potential consequences (that a body attachment could be ordered) if he did not appear. De la Cruz's mother had said she would bring De la Cruz to court on the date set.

On August 12, 2011, after De la Cruz had not appeared, Ahn went back to De la Cruz's address and spoke with Espandola, who said that on August 7, De la Cruz had left home saying that he would not come to court to testify, and that he did not know where De la Cruz was. Ahn then distributed a wanted-persons flyer on the internet to police department personnel who were familiar with De la Cruz, he contacted other officers to look for De la Cruz at his residence and in areas of Santa Monica where he was known to hang out, and spoke with them on a daily basis, and there was a county-wide warrant for De la Cruz's arrest. He spoke again with Espandola on August 31, 2011, and was told that although he did not know where De la Cruz was, De la Cruz's mother had spoken with him. He determined that De la Cruz was not in police custody. He determined that

---

[9] When the relevant facts are undisputed, as they are here, we review this determination independently. (*People v. Valencia* (2008) 43 Cal.4th 268, 292; *People v. Cromer* (2001) 24 Cal.4th 889, 901.)

De la Cruz's phone was turned off, and attempted to determine whether he had a new phone number. He determined that De la Cruz was no longer attending school, and was not employed. Neither De la Cruz's mother nor Espandola would provide the police with contact information for any other relatives of De la Cruz. Another officer, who had known De la Cruz for some years as a Santa Monica 13 gang member and was familiar with his hang-outs, visited his residence, ran daily computer checks to determine whether he had been arrested in another county or by another police agency, went to locations where he had previously contacted De la Cruz, spoke with De la Cruz's fellow gang members, looked for De la Cruz in adjoining areas of Los Angeles, and spoke with De la Cruz's mother and step-brother. The trial court indicated its belief that the prosecution had not yet established reasonable diligence in finding De la Cruz, because there had been no attempt to contact his father, who was also a known Santa Monica 13 gang member.

When the due diligence hearing resumed on September 8, 2011, Officer Lorenzo testified about the efforts he had made since the previous hearing to contact De la Cruz's father. He and another officer had on three occasions conducted undercover surveillance of the father's Pacific Palisades residence, but had seen no activity, and there was no response to a knock on the door. He found another address for De la Cruz on another officer's field interview card, but saw no recognizable vehicles or activity at the address, and there was no response to a knock on the door. Surveillance at De la Cruz's mother's residence saw no activity. Another step-brother said he had not seen De la Cruz, and he had not been to his mother's residence. Repeat visits and surveillance at various addresses for De la Cruz, for his father, and for a former long-time girl friend, yielded only information that De la Cruz had not been seen for some time. A search of records at Eastlake and other juvenile and adult detention facilities yielded nothing. A computer search for any contacts of De la Cruz with police agencies in Inglewood, Manhattan Beach, Gardena, and Hawthorne found nothing.

The prosecution argued that the evidence established that the prosecution had shown reasonable due diligence in their efforts to secure De la Cruz's attendance at trial,

30

that he should be found to be unavailable, and it therefore should be permitted to read his preliminary hearing testimony to the jury. Over the appellants' objections, the trial court then granted the motion to admit De la Cruz's preliminary hearing testimony.

De la Cruz's preliminary hearing testimony, read to the jury at the trial, was that he had been sitting on a bench in Virginia Avenue Park with Juarez, Rodriguez, and McCarty, with his head down listening to music on his iPod, when Juarez tapped him on the shoulder to alert him to the approach of others. Then about 10 shots were fired from about 20 feet away. "It happened so fast, I didn't see nothing." De la Cruz dropped to the ground, then got up and ran, along with Rodriguez and McCarty. He said he told the police that he did not see the shooters' faces, but he saw two Black males in their mid-20's running toward Pico Boulevard, and the shooter was wearing a black shirt and a gray hoody. The police later asked if he could identify a number of suspects, but he could not.

A witness is "unavailable to testify" if he or she is absent from the hearing and the proponent of the prior testimony has "exercised reasonable diligence but has been unable to procure his or her attendance by the court process." (Evid. Code, § 240, subd. (a)(5).) In the trial court the appellants argued that because the subpoena to appear had been served on De la Cruz—then still a minor—rather than on his mother, the service was legally defective and due diligence to secure his attendance could not be shown. They argued also that they had not had an opportunity to cross-examine De la Cruz at the preliminary hearing with the interest and motive they had at trial, because Martin had then not yet been charged with the McKillian murder, and that killing had not yet identified as a motive for the Virginia Avenue Park shootings.

The appellants argue much the same in this appeal. Claiming prejudice, they emphasize the prosecution's exploitation of a critical gap in the evidence left by De la Cruz's absence. The fatal flaw in these arguments, however, is that De la Cruz's failure to appear left no critical gap in the evidence. The admission of his preliminary hearing testimony resulted in no apparent prejudice to them.

31

First, as the appellants argued (and the trial court conceded), the service of the trial subpoena on De la Cruz, rather than on his mother, very likely rendered the subpoena insufficient to support a contempt finding for his nonappearance. (§ 1328, subd. (b)(1) [service of subpoena on minor over 12 years old "shall be made on the minor's parent" or guardian, and on minor].) But the issue was whether the prosecution had exercised reasonable diligence in attempting to secure De la Cruz's presence at trial, not whether he would have been subject to arrest or contempt for failing to appear. Considerations relevant to the due diligence inquiry "include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored," and not just the validity of a subpoena for his appearance. (*People v. Wilson* (2005) 36 Cal.4th 309, 341.)

The appellants suggest that more should have been done to locate De la Cruz, but with no indication it would have helped. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 677 ["it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence," but Sixth Amendment does not require exhaustion of every avenue of inquiry]; *People v. Cogswell*, *supra*, 48 Cal.4th at pp. 477-479 [due diligence in attempting to secure witness's presence can be shown without resort to statutory remedy of taking witness into custody]; *People v. Smith* (2003) 30 Cal.4th 581, 624 [due diligence can be shown without threat to fine witness who refuses to testify; finding of unavailability does not require court to take "extreme measures" to secure witness's testimony]; see *People v. Hovey* (1988) 44 Cal.3d 543, 564 [cumulative evidence from prior testimony of absent witness not so critical or crucial to prosecution to require extreme precautions to prevent witness from disappearing].) The evidence amply supports the trial court's discretionary determination that the evidence recited above was more than sufficient to establish due diligence.

Second, the prior recorded testimony of an unavailable witness is admissible if at the prior hearing the defendant had an opportunity to cross-examine the witness with an interest and motive similar to his interest and motive at the hearing trial. (Evid. Code, § 1291, subd. (a)(2).) The trial court was justified in concluding that the appellants had

much the same interest, motive, and opportunity to cross-examine De la Cruz at the preliminary hearing as at the trial. Virtually the only subject of De la Cruz's preliminary hearing testimony was the identity of the Virginia Avenue Park shooters, a subject of obvious critical interest to the appellants. They argued in the trial court that at the preliminary hearing they were unaware that Martin would be charged with McKillian's murder, which would be identified as a motive for the Virginia Avenue Park shootings. But De la Cruz gave no testimony on any subject related to the McKillian killing or to his or his gang's rivalry with the Venice Shoreline Crips gang. There was little or nothing relating to those events about which he could have been cross-examined, even if they had been known to the appellants and their attorneys. (See *People v. Valencia*, *supra*, 43 Cal.4th at p. 294 [interest and motive to cross-examine need not be identical, only "similar"].)

Third—and perhaps most important in this case—the contention that the appellants were prejudiced by the admission of De la Cruz's preliminary hearing testimony lacks any plausible basis. It is true that De la Cruz's preliminary hearing testimony provided some confirmation for his earlier statements to the police that he had seen two Black males in their mid-20's running from the shooting, one wearing a black shirt and a gray hooded sweatshirt. But De la Cruz's testimony was hardly crucial in identifying the suspects. He could not identify any of the appellants as being among the shooters. And he was not alone in identifying the shooters' clothing. Rodriguez also testified that the shooters were young Black males, wearing black and gray hooded sweatshirts; McCarty testified that at the time of the shooting she saw a Black male wearing a gray hooded sweatshirt; and Officer Federico testified he saw two males in dark hooded sweatshirts running from the area of the shooting.

De la Cruz's absence from the trial left no gap in the prosecution's case, and his general descriptions of the shooters and their clothing at the preliminary hearing added little of importance to the trial evidence. Of far greater significance (and if anything helpful to the defense) was De la Cruz's admission that he could not identify any of the suspects he was shown, apparently including some or all of the appellants. The use of his

33

preliminary hearing testimony, more or less consistent with the observations and testimony of other witnesses and in some respects helpful to the appellants' defense, could not have prejudiced the appellants.

**D. The Trial Court Properly Excluded Evidence Of Birdsong's Statement That Shots Had Been Fired At Him.**

Birdsong contends that the trial court erred, and deprived him of his constitutional right to present a defense, by in excluding evidence of a statement he made about 10 minutes after the shooting, after he was pulled by a police dog from under a parked van in the backyard of a house about 500 feet from Virginia Avenue Park. At Birdsong's preliminary hearing the K9 officer had testified that when Birdsong was pulled from under the van he had said, "Man, they was shooting at me."

But the trial court ruled before the officer's trial testimony that Birdsong's statement would be excluded. However, Birdsong later argued that the prosecution "opened the door" to that evidence when the officer testified at trial that when the dog was pulling him from under the van, Birdsong had said, "I give up, I give up."

Evidence Code section 356 provides that where part of a declaration is given in evidence by one party, "the whole on the same subject may be inquired into by an adverse party . . . ." Apparently relying on that provision, Birdsong's counsel argued that the statement that "Man, they was shooting at me," should be admissible as a part of the evidence that he said, "I give up, I give up." And when the court reaffirmed its refusal to admit the statement, Birdsong's counsel moved to exclude the evidence that he had said, "I give up, I give up"—a request to which the court acceded. The court instructed the jury that the evidence of Birdsong's statements was being excluded as nonresponsive to the question, and should not be considered for any purpose.

Birdsong later renewed his request to admit evidence of his statement that "they was shooting at me," this time under subdivision (b) of Evidence Code section 1240. Evidence Code section 1240 permits the admission of a hearsay statement that purports to explain an event, and that was made "spontaneously while the declarant was under the stress of excitement" caused by his perception of the event. A spontaneous utterance is

34

considered trustworthy and admissible despite its hearsay character, because "'in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.'" (*People v. Clark* (2011) 52 Cal.4th 856, 925.) Birdsong's theory at trial was that his statement was not being offered as a spontaneous response to the excitement of being the target of shots at the park, but as "the excited utterance of the dog pulling him by his foot from underneath the van."

The trial court denied the renewed request for the statement's admissibility, ruling the statement inadmissible because it had nothing to do with the then-current stressful event of being pulled from under the van by the police dog. "[T]here's a time gap between the shootings and the time he's being pulled out from under the car. And the statement doesn't relate to anything that's occurring while he's being pulled out. It's a statement that you're trying to get in relating to an event that occurred beforehand. And so I don't see it as falling under [Evidence Code section] 1240."

Although the passage of time since the stressful event does not necessarily render a statement inadmissible under section 1240 of the Evidence Code, it is one of the relevant factors in determining its spontaneity—whether the statement was made before there was "time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." (*People v. Clark*, *supra*, 52 Cal.4th at p. 925; *People v. Lynch* (2010) 50 Cal.4th 693, 750.) The trial court was well within its discretion in ruling that any spontaneity the statement might otherwise have had was diminished by the passage of time since the shooting, and by the then-current stressful event of being pulled from under the van by the police dog. (*People v. Jones* (1984) 155 Cal.App.3d 653, 662 [quoting Wigmore treatise for proposition that trial court has broad discretion on issue of spontaneity].) The court was also correct in noting that the statement referred to the earlier event at the park, and does not "narrate, describe, or explain" the then-stressful event that was alleged to have triggered it, "the dog pulling him by his foot from underneath the van," as Evidence Code section 1240 requires.

Birdsong argues that the passage of time between the shooting and his being pulled from under the van was not so great as to render the statement unspontaneous. But that argument is inconsistent with the factual position on which he based his argument in the trial court, and on which the trial court based its ruling—that his excitement arose from being pulled from under the van by the dog, not from the shooting. Moreover, the trial court was within its discretion in ruling that the time since the shooting and the stressful event in which Birdsong was involved at the time of his statement rendered the statement unspontaneous, and therefore inadmissible under Evidence Code section 1240.

On appeal Birdsong argues for the first time that his statement should have been found admissible under Evidence Code section 1241, which provides for admissibility of a statement that is offered "to explain, qualify, or make understandable conduct of the declarant," and "was made while the declarant was engaged in such conduct." He now argues that his statement was offered to explain being pulled from under the van by his foot, the conduct in which he was then engaged. But this contention fails as well.

First, it was not raised in the trial court. Birdsong's counsel proffered the hearsay statement as admissible under Evidence Code section 1240 as an excited and spontaneous statement that described or explained the stressful event of "the dog pulling him by his foot from underneath the van." It was not admissible for that purpose, as explained above. It is now too late to argue that it might have been admissible on a different theory. "It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal. [Citations.]" (*People v. De Santiago* (1969) 71 Cal.2d 18, 22.) Birdsong's briefs in this appeal do not reply on this point, and the record suggests no justification for disregarding this rule. And for the same reason, the further suggestion that the statement should have been admissible to explain why Birdsong was hiding in the first place—a theory articulated for the first time in his reply brief—also comes too late.

Finally, there is no reasonable possibility the outcome of Birdsong's trial was affected by the exclusion of the evidence that when he was pulled by a police dog from

his hiding place under the van, he had said, "Man, they was shooting at me." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [proper standard of review for exclusion of hearsay evidence is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836].) The shooting had occurred in the park about 10 minutes earlier; two men were seen running from the area of the shooting in the direction of where a car had been parked with its lights on, which pulled away when a police spotlight illuminated it, following the two men running toward it; Birdsong was hiding under a van in a nearby backyard; clothes matching the description of those worn by the shooters, apparently discarded nearby, were linked to Birdsong by DNA; a gun matching the description of one used by the shooters was found discarded nearby; Birdsong tested positive for gunshot residue; the car that had driven away had Mermer, Cole, and Martin's cellphone inside, along with a cellphone bearing Birdsong's thumbprint; and there was no indication of any way Birdsong (or Martin) had gotten from Venice to the Virginia Avenue Park, or planned to get from the park back to Venice, other than in the car with Mermer, Cole, Martin's cellphone, and Birdsong's thumbprint. In the context of this evidence, it is not reasonably probable that the verdict would have been more favorable to Birdsong even if the jury had learned that when he was pulled by the police dog from under the van, Birdsong had claimed to have been a victim of the shooting, rather than a perpetrator.

V. **Trial Court Did Not Abuse Its Discretion By Failing To Further Investigate A Juror's Use Of A Telephone During Trial.**

Appellants contend that the trial court abused its discretion and deprived them their federal and state constitutional rights to a fair trial and due process by failing to adequately investigate and act on information that one of the trial jurors was consistently using his telephone during trial. We find no merit in the contention.

The basis for the appellants' contention arose during the first day of testimony in the 6-week trial. Before the jury returned to the courtroom at the conclusion of a break, the prosecution advised the court about Juror No. 2: "I don't know if he's texting or surfing the web or something, but he's consistently on his phone" in the courtroom (apparently during the trial proceedings). The prosecutor's observation was followed by

comments of each of the defendants' attorneys and the court—all plainly in jest—that the likely subject of any web search was the origins of seal of the State of California (apparently arising from an earlier comment, for which the judge blamed himself). Neither the defendants' counsel nor the prosecution requested any further inquiry or investigation; Birdsong's attorney asked that any further discussion of the matter await the jury's return. When the jury returned the court advised the jury, "And I remind you, don't research Minerva [who is depicted on the State seal] or anything else while we're in session here. The phones stay put away, okay, while the court is in session. Okay?" Trial testimony then resumed. The record indicates no repetition or discussion of the matter during the remainder of the trial.

Appellants liken the situation to one in which a juror has fallen asleep during trial proceedings, justifying the court in discharging the juror for inability to perform the juror's duties. The rule is explained in *People v. Bradford* (1997) 15 Cal.4th 1229, a case in which counsel had observed a juror sleeping throughout at least one full day of trial: "'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged. [Citation.]'" (*Id*. at p. 1348.)

The court in *People v. Bradford* went on to state the rule that applies here: "'"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial."'" [Citation.] A hearing is required only where the court possesses information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case." (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1348.) "'[T]he mere suggestion of juror "inattention" does not require a formal hearing disrupting the trial of a case. [Citation.]'" (*Ibid.*)

The *People v. Bradford*, *supra*, court concluded that there was no abuse of discretion in the trial court's failure to further inquire in that case, in light of the limited period of time that the juror was inattentive. And it noted also that "counsel's observation concerning the juror, made without a concomitant assertion of juror misconduct or request for a hearing on the subject [citation], further indicates that the juror's conduct had not warranted such a hearing." (*Id.* at p. 1349; see *People v. Holloway* (2004) 33 Cal.4th 96, 126 [defendant's failure to seek more extensive or broader inquiry into possibility of juror's inability to perform duties waived any claim of error in court's failure to inquire further].)

Here, as in *People v. Bradford*, *supra*, no further hearing or inquiry was required. The information before the court indicated at most a failure to adhere to the court's instructions concerning courtroom behavior (not unusual at a trial's outset), and here, as in *People v. Bradford* and *People v. Holloway*, the defendant sought no further inquiry, and had apparently concluded that the court's sua sponte reminder admonition to the jury was sufficient. Indeed, even on appeal there is no reason to doubt the effectiveness of the trial court's reminder admonition, which went beyond anything the defendants had requested, and apparently cured Juror No. 2 of his offending conduct for the remainder of the trial. The ability of Juror No. 2 to perform his duties during the remainder of the trial do not "appear in the record as a demonstrable reality," as would be necessary to require any further action on the trial court's part. (*People v. Holloway*, *supra*, 33 Cal.4th at pp 124-125.)

Finally, even if the trial court's failure to inquire further had constituted error, the error was unquestionably harmless beyond any reasonable doubt. It occurred during the first day of the trial, when the subject of testimony related solely to the events preceding the murder of McKillian—of which only Martin was accused, and of which he was acquitted. No evidence presented during Juror No. 2's reported use of his telephone could have related to whether the appellants were involved with the Venice Shoreline Crips gang, whether the appellants were aware of the rumors after McKillian's murder

39

that a rival gang was involved, or whether the appellants were involved with the Virginia Avenue Park shooting.

## VI. The Abstract Of Judgment Must Be Corrected To Accurately Reflect The Sentence Imposed Upon Cole.

The abstract of judgment reflects that for the murder of Juarez in count 1, the trial court sentenced Cole to imprisonment for 25 years to life, with a consecutive 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1); and for the attempted murder in count 2, it sentenced Cole to life in prison, with a consecutive sentence of 15 years to life for the firearm enhancement. However—as respondent rightly concedes—the reporter's transcript reveals that the court actually ordered Cole's sentence for the attempted murder in count 2 to run concurrently, not consecutively, with the count 1 sentence.

Courts—including courts of appeal—have inherent power to correct clerical errors in order to make its abstract of judgment accurately reflect the oral judgment of the sentencing court. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, 186-187; *In re Candelario* (1970) 3 Cal.3d 702, 705.) Accordingly, we will order the Abstract of Judgment corrected to reflect the sentence for the attempted murder in count 2 to be life in prison with a consecutive sentence of 15 years to life, to run concurrently with the sentence on count 1.

**Disposition**

The Abstract of Judgment is ordered corrected to reflect appellant Cole's sentence for attempted murder in count 2 to be life in prison with a consecutive sentence of 15 years to life, to run concurrently with his sentence on count 1.  In all other respects the judgment is affirmed as to all appellants.

NOT TO BE PUBLISHED.

                                        CHANEY, Acting P. J.

We concur:


        JOHNSON, J.


        WILEY, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.